764 F.2d 240
 6 Employee Benefits Ca 1756
 Johnny BABB, William R. Foster, Jr. and Rebecca Q. Owens, Appellants,
v.
OLNEY PAINT COMPANY, B. Leroy Dodson, L. Paul Barnes, David
R. Alley, Randall Dodson as members of the Committee for the
Olney Paint Company Money Purchase Pension Plan and Trust
dated November 15, 1977 and Olney Paint Company Profit
Sharing Plan and Trust dated November 15, 1977; The
Citizens and Southern National Bank of South Carolina, Trust
Department as Trustee for Olney Paint Company Money Purchase
Pension Plan and Trust dated November 15, 1977 and Olney
Paint Company Profit Sharing Plan and Trust dated November
17, 1977, Appellees.
 No. 84-1985.
 United States Court of Appeals,
Fourth Circuit.
 Argued April 4, 1985.
Decided June 13, 1985.
 
 Arthur H. McQueen, Jr., Spartanburg, S.C. (McQueen & Lettman, Spartanburg, S.C. on brief), for appellants.
 William O. Pressley, Jr., Columbia, S.C. (Dwight F. Patterson Jr., Perrin, Perrin, Mann & Patterson, Spartanburg, S.C. on brief), for appellees.
 Before MURNAGHAN, ERVIN and WILKINSON, Circuit Judges.
 MURNAGHAN, Circuit Judge.
 
 
 1
 A divorce between individuals and a split up of a corporate entity have some similar characteristics. In particular, disputes are apt to arise over the division of property. Even claims of beneficiaries of the principals are likely to be disputed.
 
 
 2
 Such was the situation here. Olney Paint Company ("Olney") operated two divisions, one manufacturing paint, the other producing other types of wallcoverings. A time came when it was decided to split off the paint division, and such occurred effective November 30, 1981, the end of the fiscal year for Olney and for its money purchase pension plan and profit sharing plan. The paint manufacturing division's assets, including inventory and accounts receivable, as well as liabilities were transferred to the newly formed Alley Paint Company, Inc. ("Alley").
 
 
 3
 Problems concerning the rights of several employees who left Olney to work for Alley arose with respect to interests in the Olney pension and profit sharing plans which had been organized under the Employment Retirement Income Security Act of 1974, 29 U.S.C. Sec. 1001, et seq. ("ERISA"). Three employees have brought an action against Olney, members of the administrative committees for the pension and profit sharing plans and the Citizens and Southern National Bank of South Carolina as trustee for the two plan trusts. The three employees found themselves in the awkward position of facing forfeiture of their accrued but non-vested interests under the pension plan and the profit sharing plan. Vesting was called for on an annual percentage basis, and no further vesting was to occur for any employee upon termination of employment with Olney. Johnny Babb, on November 30, 1981, was 50% vested in the profit sharing plan. The unvested portion which he stood to lose amounted to $11,220.68. His 55% non-vested share in the pension plan amounted to $9,724.01. William R. Foster, Jr., also 50% vested in the profit sharing plan, faced forfeiture under it of $9,050.72. His 55% non-vested share in the pension plan amounted to $7,850.25. Rebecca Q. Owens, being 30% vested in the profit sharing plan, stood to forfeit under it $2,494.00. Not being vested at all under the pension plan, her prospective loss amounted to $3,527.61.
 
 
 4
 As of November 30, 1981, 109 employees participated in the profit sharing plan and the pension plan. Faced with termination if they did not resign from Olney and accept employment with the split-off Alley Paint Company, Inc., sixteen employees made the transfer. Two of them were fully vested in each of the plans. The percentage of those excluded from in futuro participation including vesting (16 of 109) amounted to 14.7%. The fourteen not fully vested amounted to 12.84% of all employees.
 
 
 5
 With the advent of ERISA, a new factor of considerable importance for the interpretation and governance of profit sharing and pension plans appeared on the scene. While Internal Revenue Service Rulings do not have binding effect upon courts faced with interpretation of such plans, nevertheless, the IRS' interpretations of a statute it administers are entitled "to great weight." Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205, 210, 93 S.Ct. 364, 367, 34 L.Ed.2d 415 (1972); Treadco Tires, Inc. v. United States, 604 F.2d 14, 16 (5th Cir.1979).
 
 
 6
 ERISA provides that, upon complete or partial termination of a plan, "benefits accrued to the date of such ... termination ... are nonforfeitable." 26 U.S.C. Sec. 411(d)(3). Both the profit sharing plan and the pension plan explicitly provided:
 
 
 7
 Upon the termination or partial termination of the Plan or upon the complete discontinuance of the Employer's contributions, the Trust Fund shall be segregated and ... the interests of all Participants shall become fully vested, shall not thereafter be subject to forfeiture and shall be distributed to the Participants as and when the Committee shall designate....
 
 
 8
 The thrust of appellants-plaintiffs' claims is that a complete or partial termination of the profit sharing plan and a partial termination of the pension plan[1] had, in fact, occurred on or before November 30, 1981 while they were still participants and, consequently, they were entitled to full vesting. The defendants argued to the contrary and prevailed in a court trial.
 
 
 9
 The IRS has ruled that a partial termination shall be deemed to have occurred when a "significant percentage" of employees covered by the plan is excluded from coverage. Rev.Rul. 81-27, 1981-1 C.B. 228. The significant percentage which serves to determine whether there has been a partial termination has not been reduced to any specific number. What constitutes a significant percentage is preeminently a matter of fact. The Secretary of the Treasury has provided that:
 
 
 10
 Whether or not a partial termination of a qualified plan occurs (and the time of such event) shall be determined by the Commissioner with regard to all the facts and circumstances in a particular case. Such facts and circumstances include: the exclusion by reason of a plan amendment or severance by the employer, of a group of employees who have previously been covered by the plan; and plan amendments which adversely affect the rights of employees to vest in benefits under the plan.
 
 
 11
 Treas.Reg. Sec. 1.411(d)-2(b)(1).[2] See also Treas.Reg. Sec. 1.401-6(b)(2) (1963). Cf. Weil v. Retirement Plan Administrative Committee for the Terson Company, Inc., et al., 750 F.2d 10, 12 (2d Cir.1984).
 
 
 12
 In the ensuing bench trial, the district judge carefully considered all the factual presentations of the parties. As is not uncommonly the case, there was evidence in support of both positions sufficient to make not clearly erroneous a decision either way.[3] Federal Rule of Civil Procedure 52(a) mandates that the result reached by the district judge is not to be disturbed if there are adequate facts to support it, even though we might have preferred a determination to the contrary.[4] Anderson v. City of Bessemer, --- U.S. ----, 105 S.Ct. 1504, 1511-12, 84 L.Ed.2d 518 (1985).
 
 
 13
 The district judge not only relied on the 12.4% figure as not constituting a "significant percentage" in reaching a decision on whether a partial termination had occurred, he further determined, in concluding that neither a partial nor a complete termination took place, that:
 
 
 14
 1) The decision, roughly contemporaneous with the split-off of Alley Paint, not to make further contributions to the profit sharing plan was the result, thought at the time to be temporary, of unfavorable business and economic conditions and not a prelude to future total discontinuance of contributions by Olney as the employer. The addition of new participants to the profit sharing plan following the initial year in which no contributions were made was recognized by the district judge to be a factor militating against an intent to discontinue.[5]
 
 
 15
 2) When a decision to seek IRS approval for discontinuance of the profit sharing plan was made, it occurred only at the end of plan year 1982. Reduced profits and overall poor economic conditions, not the earlier 1981 split-off, were, in the district court's findings, the reasons for discontinuance which only subsequently occurred in 1983.
 
 
 16
 3) The action of the Internal Revenue Service upon reviewing Olney's "Application for Determination upon Termination" Form 5310 filed on January 17, 1983 supported the conclusion that partial termination had not occurred for the profit sharing plan back on or before November 30, 1981. The form revealed that the last contribution had been made in August 1981 for the plan year 1980. It further sought a favorable decision with respect to the proposed termination. The IRS concluded that, despite the suspension of payments since August 1981, the plan, nevertheless, was qualified and on-going up at least until the time that the Notice of Intent to Terminate was filed on January 17, 1983.[6]
 
 
 17
 4) The fact that the paint division employees were not given a choice to remain with Olney rather than accept new employment with Alley did not necessarily create a partial termination of the plans. The employee requirements of Olney and Alley differed sufficiently to insulate the district judge's finding from successful attack.
 
 
 18
 There were, of course, elements of evidence which would have supported a factual determination that impermissible favoritism towards principal beneficiaries of the profit sharing and pension plans, not valid business justification, was the motivation behind the actions of some of the defendants.[7] Also, Olney executives received handsome raises after 1981, and Olney's net sales actually increased following the split-off, considering that the company had two tax years during calendar year 1982. Obviously, however, the increase in the salaries of a corporation's officers does not in isolation irrefutably establish that the company was not experiencing financial problems or actually was all along secretly intending to terminate the profit sharing plan. The same analysis discloses the lack of definitive proof of a plan to discontinue contributions to the profit sharing plan as a consequence of the 1981 initiation of a large expansion plan for Olney. The district court was presented with Olney's financial records and determined that the financial position of the company justified omission of a contribution to the profit sharing plan without establishing that already the possibility of future contributions was entirely foreclosed.
 
 
 19
 A suggestion is also made by the plaintiffs that certain fiduciary duties of loyalty were not observed. The implication rests on the consideration that the principal beneficiaries profiting from the reallocation of the forfeited non-vested interests of the plaintiffs were officers, shareholders or other highly compensated employees. Furthermore, one of the former principals of Olney, David R. Alley, may have received an improper, premature payment of his wholly vested plan shares.
 
 
 20
 In the first place, the argument was not presented to the district court and, since no showing of exceptional circumstances has been made, we are precluded from giving it any consideration on appeal. Wilkinson v. United States, 677 F.2d 998, 1002 (4th Cir.1982), citing United States v. One 1971 Mercedes Benz, etc., 542 F.2d 912, 915 (4th Cir.1976). Secondly, to the extent evidence on which the breach of fiduciary duty claim was made was before the district judge, it was patently deemed by him to be insufficient to establish November 30, 1981 as a date of termination, complete or partial, of the plans.
 
 
 21
 Furthermore, there was evidence before the district judge that a roll-over of the new Alley Paint employees into a new retirement plan, with the result that they could then continue to vest as before was considered, but the idea was abandoned upon receipt of information that ERISA would not permit such a transaction as between two separate corporations. Believed by the district judge, that information sufficed to refute a contention of improper predatory motive.
 
 
 22
 All in all, the district court gave careful attention to the pertinent facts surrounding the company's decision to split-off its paint division. Its finding that neither a partial nor a complete termination of the profit sharing plan or pension plan occurred on or before November 30, 1981 was not clearly erroneous and, consequently, we affirm.
 
 
 23
 AFFIRMED.
 
 
 
 [1]
 The pension plan, created November 15, 1977, was never completely terminated by Olney and was still in existence at the time of trial
 
 
 [2]
 Similarly, a determination of whether a complete termination of contributions to a qualified plan has occurred involves a review of "all the facts and circumstances in the particular case, and without regard to the amount of any contributions made under the plan by employees. Among the factors to be considered in determining whether a suspension constitutes a discontinuance are: (i) Whether the employer may merely be calling an actual discontinuance of contributions a suspension of such contributions in order to avoid the requirement of full vesting as in the case of a discontinuance, or for any other reason; (ii) Whether contributions are recurring and substantial; and (iii) Whether there is any reasonable probability that the lack of contributions will continue indefinitely." Treas.Reg. Sec. 1.411(d)-2(d)(1)
 
 
 [3]
 Plaintiffs-appellants, in their Brief candidly state: "There is no question that the documents and testimony put forth by the defendants would support the findings of the lower court."
 
 
 [4]
 Appellants depict a situation which they effectively demonstrate is pregnant with suspicion. There were indeed grounds to suspect that self-interest led some at least of the fiduciary appellees to masquerade a November 30, 1981 actual discontinuance as merely a temporary suspension. Nevertheless, there were facts before the district judge sufficient to rebut the suspicion. Indeed, appellants frankly admit that "[t]he integrity of the Defendants are [sic] not questioned."
 
 
 [5]
 Appellants diminish, but do not destroy, the force of the argument by pointing out that the plan rules mandated the admission of such new participants. However, the delay in formally seeking IRS approval of discontinuance, coupled with the consequential admission of new participants permitted the inference drawn by the district judge
 
 
 [6]
 It is true that there were errors as to some information supplied in the Form 5310. The number of employees holding accrued but non-vested interests was substantially misstated and forfeitures of nearly $73,000 were not disclosed. However, the district judge permissibly concluded that the crucial information for the purposes of the IRS was the date of the last contribution in August 1981 and the fact that no further contributions were going to be made in the near future. He regarded the inaccuracies as essentially irrelevant to the question the Form 5310 was introduced for, namely, whether discontinuance was planned on or before November 30, 1981 or only subsequent to that date. In regarding the form as supportive of the conclusion that the plan's continuing life carried on beyond November 30, 1981 he was not clearly erroneous
 
 
 [7]
 The fact that, about a year before the split-off, there was an unsuccessful attempt to sell the paint division, at which time Babb was told that, upon a sale, he would receive non-vested as well as vested benefits, while indicative, was by no means determinative. The district judge considered that fact to be outweighed by the evidence supporting a conclusion that a complete or partial termination had not taken place