Harold SAGE, Georgianna Wong, Lonnie Lawton, Mae Dyer, Dianne Berroth, Jean Alden, and Richard Dominguez, Plaintiffs–Appellants and Cross–Appellees,

v.

AUTOMATION, INCORPORATED PENSION PLAN AND TRUST; Automation, Incorporated Profit Sharing Plan and Trust; Harold M. Goodman, as Trustee of Automation, Incorporated Profit Sharing Plan and Trust; Harold M. Goodman, individually; Janice M. Finley, as member of Advisory Committee of Automation, Incorporated Pension Plan and Trust; Janice M. Finley as member of Advisory Committee of Automation, Incorporated Profit Sharing Plan and Trust; Harold M. Goodman, as member of Advisory Committee of Automation, Incorporated Pension Plan and Trust; Harold M. Goodman, as member of Advisory Committee, of Automation, Incorporated Profit Sharing Plan and Trust; and Automation, Incorporated, a Kansas corporation, Defendants–Appellees and Cross–Appellants.

Nos. 85–2036, 85–2136.

United States Court of Appeals,
Tenth Circuit.

April 28, 1988.

Donna M. Dill, Topeka, Kan. (Henry L. Hiebert, Topeka, Kan., Jay W. Vander

Velde, Atherton, Sanderson and Vander Velde, Emporia, Kan., with her on the brief), for plaintiffs-appellants and cross-appellees.

Michael G. Norris, Niewald, Waldeck, Norris & Brown, Overland Park, Kan., for defendants-appellees and cross-appellants.

Before McKAY, TACHA and BALDOCK, Circuit Judges.

BALDOCK, Circuit Judge.

■ This appeal and cross-appeal concern the legal characterization, under the Employment Retirement and Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001 to 1461, and the Internal Revenue Code, of various events that occurred at the former employer of appellants, Automation, Inc. (Automation). Employer pension and profit-sharing plans must comply with ERISA and also must conform to various Code requirements to qualify for favorable tax treatment. Appellants contend that the pension and profit sharing plans of Automation did not comply with either. Specifically, appellants maintain that their departure from the firm was a partial termination of the pension and profit sharing plans, entitling them to full vesting of amounts credited to their plan accounts with interest. *See* I.R.C. § 401(a)(7) and § 411(d)(3)[1] (plan must provide that accrued benefits, to the extent funded, or amounts credited to employees' pension and profit sharing accounts, are nonforfeitable upon termination or partial termination of the plan). They also maintain that the plans failed to provide an adequate claims denial procedure and that such a failure constitutes a breach of fiduciary duty on the part of the plans' trustee. *See* 29 U.S.C. §§ 1133 & 1104(a)(1)(A)(i), (a)(1)(B) & (D). Appellants sought compensatory and punitive[2] damages based on the appellees' failure to provide an adequate claims procedure and also sought costs and attorney's fees. Appellees contended that appellants' claims were without merit and barred by the three year limitations period contained in 29 U.S.C. § 1113(a)(2). Appellees also sought costs and attorney's fees necessitated by this action.

Appellee Automation performed various accounting services for several clients. Appellee Harold Goodman was the sole shareholder and president of the firm and the sole trustee of the company's pension and profit-sharing plans. Appellees Goodman and Janice Finley also were on the advisory boards of the plans, which were adopted in April 1972, and provided for vesting of an employee's interest in a contribution account at a rate of 10% per year, beginning on the third year of employee participation. The appellants were all plan participants. In December 1975, all but one of the appellants left Automation and obtained other employment with Volume Shoe, a major client of Automation, when Volume Shoe decided to develop in-house

---

1. Technically, the following Code section, which has been amended, governs this appeal:

     I.R.C. § 401(a)(7). A trust shall not constitute a qualified trust under this section unless the plan of which such trust is a part provides that, upon its termination or upon complete discontinuance of contributions under the plan, the rights of all employees to benefits accrued to the date of such termination or discontinuance, to the extent then funded, or the amounts then credited to employees accounts are nonforfeitable.

     Pub.L. No. 87–792, § 2(2), 76 Stat. 809 (1962). The present Code sections provide:

     I.R.C. § 401(a)(7). A trust shall not constitute a qualified trust under this section unless the plan of which such trust is a part satisfies the requirements of section 411 (relating to minimum vesting standards).

     I.R.C. § 411(d)(3). Termination or partial termination; discontinuance of contributions.

     —Notwithstanding the provisions of subsection (a), a trust shall not constitute a qualified trust under section 401(a) unless the plan of which such trust is a part provides that—

     (A) upon termination or partial termination,

     . . . . .

     the rights of all affected employees to benefits accrued to the date of such termination, or discontinuance, to the extent funded as of such date, or the amounts credited to the employees' accounts are nonforfeitable.

     . . . . .

2. We agree with the Fifth Circuit that punitive damages are not available in an ERISA action. *Sommers Drug Stores v. Corrigan Enter.*, 793 F.2d 1456, 1462–64 (5th Cir.1986), *cert. denied,* — U.S. ——, 107 S.Ct. 884, 1298, 93 L.Ed.2d 837, 94 L.Ed.2d 154 (1987).

accounting capability. The trial court specifically found that all of the appellants were offered the opportunity to stay with Automation, rather than seek employment with Volume Shoe. By February 1976, appellant Dominguez had left the employ of Automation.

On the advice of an accounting firm, the plans' trustee did not characterize the departure of these employees as a partial termination of the plans; rather, the appellants were considered partially vested for 10% of their proportionate interests, with the exception of appellant Wong, who was considered partially vested for 20%. The plans' trustee wrote the appellants, informing them of the decision to grant partially vested benefits and including checks for partially vested amounts.

Shortly thereafter, appellee Goodman sold the assets of Automation and terminated the plans. He had been attempting to sell Automation since 1973. Upon termination of the pension and profit sharing plans, the 16 remaining employees were to receive 100% vesting. I.R.C. § 401(a)(7) and § 411(d)(3). In late 1976, appellants learned of this and inquiry was made by one of the appellants concerning further benefits for the former employees. Upon the advice of the plans' accounting firm, the trustee responded that the former employees would not be receiving further benefits. Thereafter, the appellees sought, and ultimately received, a determination from the Internal Revenue Service that the circumstances under which the plans were terminated did not affect the qualified status of the plans. In making this determination, the IRS apparently concluded that a partial termination had not occurred when the appellants left the employ of Automation. This determination was based on four days of field work by a revenue agent, including two days of interviews with the appellants.

Prior to that determination, appellants were represented by counsel. Appellants' counsel sought and received copies of the plans from the trustee's counsel, but not the application for determination submitted to the IRS. Appellants' counsel wrote the IRS explaining the appellants' position that a partial termination of the plans had occurred with the loss of the Volume Shoe account. Thereafter, the trustee's accounting firm forwarded an opinion letter to the IRS explaining why a partial termination had not occurred. Appellants' counsel received a copy and drafted a response, which was sent to the IRS.

Shortly thereafter, a meeting was held in the office of the plans' trustee concerning the issue of partial termination. Two of the appellants were present together with their counsel. The trustee was represented by counsel and an accountant. The trustee's representatives restated the position that no partial termination had occurred. Appellants requested that they be provided a copy of all correspondence with the IRS concerning the application for determination. This request was denied by the trustee's counsel, and appellants were unable to convince the IRS to disclose the information.

After a bench trial, the trial court concluded that a partial termination of the plans, which would have entitled appellants to full vesting, had not occurred. Underlying this conclusion is the factual finding that appellants voluntarily left their employment with Automation. On appeal, appellants do not contest the trial court's factual findings on this issue, but renew their contention that partial termination of a qualified plan occurs as a matter of law whenever a substantial reduction in plan participants occurs in connection with a significant corporate event. Under appellants' approach, whether an employee voluntarily left an employer would not be considered. Rather, the focus would be on whether there was a significant reduction in the work force over a short period of time, without regard to the cause of that reduction. The trial court rejected this approach, relying on pertinent authority.

■ Although partial termination is not defined in the Code, the regulations and revenue rulings of the Commissioner are entitled to important consideration. *Babb v. Olney Paint Co.*, 764 F.2d 240, 242 (4th Cir.1985). Initially, we must decide which

regulation controls this case. All of the appellants, save appellant Dominguez, left the employment of Automation in December 1975, and took positions with Volume Shoe. Appellant Dominguez left Automation as of February 1976. The pension and profit sharing plans were terminated on April 30, 1976, the end of the fiscal year for both plans. These dates are relevant because it has been suggested by appellees that an arguably more inclusive test for partial terminations was enacted for plan years beginning after December 31, 1975. I.R.C. § 411(d)(3); Treas.Reg. § 1.411(d)–2;[3] Treas.Reg. 1.411(a)–2(b). Thus, the appellants' departure from Automation and the final termination of the plans occurred in the latter part of a plan year beginning *before* December 31, 1975, and the new test, to the extent it differs from the former regulation, would not apply. Stated another way, the more recent version of the test would have applied to Automation plan years beginning after April 30, 1976, however, the events in question occurred before that time and indeed, the plan was terminated before any plan year could begin after December 31, 1975.

■ Thus, the applicable regulation concerning partial termination in this case is former Treas.Reg. § 1.401–6(b)(2) (1963) which provides:

**(b) Termination defined.**

.   .   .   .   .

(2) ... Whether or not a partial termination of a qualified plan occurs when a group of employees who have been covered by the plan are subsequently excluded, either by reason of an amendment to the plan or by reason of being discharged by the employer, will be determined on the basis of all the facts and circumstances. Similarly, whether or not

a partial termination occurs when benefits or employer contributions are reduced, or eligibility or vesting requirements under the plan are made less liberal, will be determined on the basis of all the facts and circumstances.

Because the difference between the current and former regulation is slight, the current regulation and the cases interpreting it are of considerable assistance. We begin with the proposition that whether a partial termination occurred is a question of law, one which we review *de novo*. *Bruch v. Firestone Tire and Rubber Co.*, 828 F.2d 134, 149 (3rd Cir.1987), *cert. granted*, —— U.S. ——, 108 S.Ct. 1288, 99 L.Ed.2d 498 (1988). Specific legal consequences flow from that determination; in this case, if partial termination occurred, appellants would be entitled to additional benefits as we interpret the plans. If partial termination did not occur, appellants would not be entitled to additional benefits.

We agree with the trial court that under this regulation, a partial termination did not occur. The exclusion of appellants from the plan was not due to "an amendment to the plan or by reason of being discharged by the employer." *Id.; see, e.g.,* Rev.Rul. 72–510, 1972–2 C.B. 223 (partial termination occurred when employer closed down a division and discharged 58% or 95 out of 165 plan participants); Rev. Rul. 72–439, 1972–2 C.B. 223 (partial termination occurred when union contract required plan amendment resulting in 120 of plan's 170 or 71% of the plan's participants becoming ineligible). Nor was there an "effective exclusion" of the appellants from the plan due to a corporate event beyond the control of the appellants. *See* Rev. Rul. 73–284, 1973–2 C.B. 139 (partial termination when employer acquired new business location 100 miles away and 12 of

---

3. Treas.Reg. § 1.411(d)–2, effective for plan years beginning after December 31, 1975, Treas. Reg. § 1.411(a)–(2)(b), currently provides:
   **(b) Partial Termination—(1) General rule.** Whether or not a partial termination of a qualified plan occurs (and the time of such event) shall be determined by the Commissioner with regard to all the facts and circumstances in a particular case. Such facts and circumstances include: the exclusion, by rea-

son of a plan amendment or severance by the employer, of a group of employees who have previously been covered by the plan; and plan amendments which adversely affect the rights of employees to vest in benefits under the plan.

The district court determined that under this current regulation, appellants would not prevail on the partial termination issue. We agree.

15 employees declined to transfer). Although appellants sought to establish that they were constructively discharged and effectively excluded from the plan, the trial court found otherwise. We have reviewed the factual findings of the trial court on this issue carefully, and in light of the substantial testimonial and documentary record, we must conclude that those findings are not clearly erroneous. Fed.R.Civ. P. 52(a); *Anderson v. City of Bessemer City,* 470 U.S. 564, 573–76, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). The trial court's conclusion that there was no partial termination under Treas.Reg. § 1.401–6(b)(2) (1963) follows from its factual findings.

■ Appellants contend that a partial termination of a qualified plan takes place as a matter of law when a substantial reduction in plan participants occurs in connection with a significant corporate event. This contention is incomplete for two reasons. First, the substantial reduction in plan participants must be attributable to "involuntary exclusions" or "employee terminations" from the plan. *Kreis v. Charles Townley, M.D. & Associates,* 833 F.2d 74, 79 (6th Cir.1987); *Weil v. Retirement Plan Admin. Comm. for the Terson Co.,* 750 F.2d 10, 12–13 (2d Cir.1984). Voluntary employee decisions to leave the employer or terminations not connected with the significant corporate event do not constitute "employee terminations" which would trigger partial termination. *Weil,* 750 F.2d at 13. Employer terminations which do not affect a significant percentage of employees do not constitute a partial termination. *Kreis,* 833 F.2d at 83 (exclusion of 15% and 13.6% of plan participants did not constitute significant percentage); *Wishner v. St. Luke's Hosp. Center,* 550 F.Supp. 1016, 1019 (S.D.N.Y.1982) (exclusion of 3.7% of plan participants did not constitute a significant percentage, nor would 16.7%); *Ehm v. Phillips Petroleum Co.,* 583 F.Supp. 1113, 1115–16 (D.Kan. 1984) (exclusion of 2.7% of plan participants did not constitute a significant percentage). On the other hand, employer dismissal of a significant percentage of the employees, whether caused by adverse economic conditions or factors within the employer's control, would trigger a partial termination. *Weil,* 750 F.2d at 13; *Tipton & Kalmbach, Inc. v. Comm'r,* 83 T.C. 154, 156, 160 (1984) (exclusion of 34% and 51% of plan participants constitutes significant percentage; held, partial termination occurred). The trial court did not reach the issue of whether appellants and others similarly situated constituted a significant percentage of the participants in the plans because it determined that no involuntary exclusion of appellants had occurred.

Even assuming the appellants and others similarly situated constituted a significant percentage, the second reason why a substantial reduction of plan participants does not *automatically* work a partial termination is because such a reduction must be considered along with the other facts and circumstances. *Kreis,* 833 F.2d at 79. On this point, *Babb v. Olney Paint Co.,* 764 F.2d 240 (4th Cir.1985), is instructive. In *Babb,* the employees of a division of the Olney Paint Co. were transferred in late 1981 to a newly-formed company and could no longer participate in the Olney pension and profit sharing plan. A few months earlier, the employer decided to suspend contributions to the plan and, in early 1983, the plan filed an application for determination in connection with the termination of the plan. The transferred employees argued that a partial termination occurred on or before their compulsory transfer to the new company, especially given the subsequent complete termination of the plan. The trial court determined that a partial termination had not occurred because the affected employees constituted only 14.7% of the plan's total participants, which was not a significant percentage of plan members. *Id.* at 243. Equally important, however, the trial court suggested other independent reasons why there was not a partial termination. The initial suspension of plan contributions was envisioned as temporary, due to poor economic conditions, and the decision to terminate the plan was made subsequent to the departure of the employees. *Id.* Moreover, the decision to transfer the employees was justified from

a business standpoint and was not made in order to favor the principal beneficiaries of the plan. *Id.* at 244. On appeal, a panel of the Fourth Circuit affirmed the decision of the trial court because there was evidence to support the contentions of both parties, so a decision either way could not be clearly erroneous. *Id.* at 243. The trial court was affirmed even though there were strong inferences indicating that the decision to terminate the plan had been made before the affected employees were forced to transfer to the new company.

■ Somewhat less apposite are the cases cited by the parties. Appellants rely on *Wishner v. St. Luke's Hospital Center*, 550 F.Supp. 1016, to support their contention that the departure of a significant number of employees due to a significant corporate event works an automatic partial termination. In *Wishner*, a neighborhood health care facility ended its affiliation with a local hospital so that the neighborhood facility would continue to receive federal funds. The neighborhood facility's employees were dropped from the hospital's plan and argued that a partial termination of the plan occurred when they could no longer participate. The trial court determined that a partial termination had not occurred because the affected employees constituted only 3.7% of plan members, not a significant percentage for partial termination. *Id.* at 1019. In so holding, the court rejected the employees' argument that the significant percentage test should not be applied because the employees' termination from the hospital plan was beyond the control of all concerned. *Id.* The district court remarked that the reason for the discharge of the employees is not relevant to the partial termination issue, but the remark was a response to the argument that the significant percentage test was inapplicable. *Id.* at 1019–20. After demonstrating termination from the plan, employees also must prove that a significant percentage of the plan members were so affected. There was nothing in the case to suggest that the employees made a voluntary decision to withdraw from the hospital's plan.

Appellants' reliance on two other cases is unavailing. In *Ehm v. Phillips Petroleum Co.*, 583 F.Supp. 1113, 1115–16 (D.Kan. 1984), the district court held that a partial termination did not occur when 2.7% of the employees participating in the plan were laid off due to a refinery closing. The significant percentage requirement for partial termination was not met. And in *Tipton & Kalmbach, Inc. v. Comm'r*, 83 T.C. at 160, the Tax Court held that employee discharges beyond the control of the employer will not prevent a partial termination when a significant percentage of plan participants are discharged. Neither case involves employees voluntarily changing jobs, which is what occurred here.

Appellants next contend that the claims procedures of the plans were inadequate. This is the more difficult issue on appeal. 29 U.S.C. § 1133 provides:

**Claims procedure**

In accordance with regulations of the Secretary, every employee benefit plan shall—

(1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

(2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

At times relevant to this decision, regulations had not been adopted to carry out the purpose of this section. Those regulations became effective for claims filed on or after October 1, 1977. 29 C.F.R. § 2560.503–1. In *Wolfe v. J.C. Penney Co.*, 710 F.2d 388, 391–92 (7th Cir.1983), however, the Seventh Circuit determined that substantial compliance with 29 C.F.R. § 2560.503(1)(f)(1) through (4) was necessary to meet the requirements of § 1133, even in the absence of the regulations' adoption.

■ 29 C.F.R. § 2560.503–1(f) provides:

(f) Content of notice. A plan administrator or, if paragraph (c) of this section is applicable, the insurance company, insurance service, or other similar organization, shall provide to every claimant who is denied a claim for benefits written notice setting forth in a manner calculated to be understood by the claimant: (1) The specific reasons for the denial; (2) Specific reference to pertinent plan provisions on which the denial is based; (3) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material is necessary; and (4) Appropriate information as to the steps to be taken if the participant or beneficiary wishes to submit his or her claim for review.

Application of this section to the facts of this case leads us to conclude that there was substantial compliance with the first two factors, but not with the latter two. Appellees contend that appellants were informed on three different occasions about their treatment under the plans. This characterization is too generous. The initial letters to the appellants informing them of partial vesting *predated* appellants' claims for full vesting and could not serve as notice that claims for full vesting had been denied. Nor could a letter addressed to one of the appellants which denied her full vesting serve as notice to all of the appellants that their claims would be denied. At best, the opinion letter prepared by the trustee's accountant and provided to appellants' counsel was sufficient to comply with 29 C.F.R. §§ 2560.503–1(f)(1) & (2).

█ Appellants contend that the opinion letter was inadequate to provide notice of denial of appellants' claims. They point out that their request for a formal denial of benefits from the trustee and representatives of the plan went unanswered. We have reviewed the opinion letter and have determined that while it may have provided sufficient notice to appellants concerning rejection of their claim for additional benefits, it did not set out an adequate review procedure, and there is no other evidence of an adequate review procedure once the initial claim of appellants had apparently been rejected.

We acknowledge that the opinion letter falls short of the notice requirements now in effect. It is an opinion letter addressed to the trustee of the plans, not a letter to plan participants denying additional benefits. It advances two independent theories for denying full benefits to the employees: the voluntary departure of the employees and the lack of a "significant percentage" of employees departing. By its nature it is somewhat adversarial. But given the trial court's decision on the partial termination issue, the letter was sufficiently accurate to inform the beneficiaries of why their initial claim for additional benefits was denied.

While the letter does not mention any specific provisions in the plans, it explains the partial termination concept, on which the denial of additional benefits was based. Nonforfeiture of contributions in employee accounts on partial termination was a statutory prerequisite for a qualified plan and was determined in part by applying former Treas.Reg. § 1.401–6(b)(2), and the pertinent revenue rulings, to the facts of this case. The opinion letter cited some applicable authority for the denial and accomplished partially the purpose served by referencing pertinent plan provisions. In sum, the letter complies with 29 U.S.C. § 1133(1) and substantially complies with 29 C.F.R. §§ 2560.503–1(f)(1) and (2).

We cannot say that the letter or the procedure followed by the trustee in this case complied with 29 U.S.C. § 1133(2) or substantially complied with 29 C.F.R. § 2560.503–1(f)(3) & (4). Although the statute, 29 U.S.C. § 1133(2), may not literally require a written claims review procedure, it does require a reasonable opportunity for a full and fair review of the denial of a claim. *Brown v. Retirement Comm. of Briggs & Stratton Retirement Plan,* 797 F.2d 521, 533 (7th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1311, 94 L.Ed.2d 165 (1987). In this context, a full and fair review means "knowing what evidence the decision-maker relied upon, hav-

ing an opportunity to address the accuracy and reliability of the evidence, and having the decision-maker consider the evidence presented by both parties prior to reaching and rendering his decision." *Grossmuller v. Int'l Union, United Auto. Aerospace & Agric. Implement Workers of Am., Local 813*, 715 F.2d 853, 858 n. 5 (3rd Cir.1983).

Judged against these standards, the claims review procedure in this case was deficient. The opinion letter did not describe any additional information needed to perfect the claim, nor did it elaborate on any sort of review process for the claims of the appellants. The meeting between the trustee, his representatives, and appellants and their counsel, which appellees have characterized as a claims review hearing, was not preceded by notice identifying it as such. Appellants were not given clear direction as to whether the decision on review of their claims would be decided by the plans' trustee, or by his agents or be based solely on the IRS determination. When the trustee and his representatives indicated that the decision on appellants' claims would be based on the IRS determination, they did not provide appellants with the application for determination nor did they provide, in a timely fashion, the supplementary information requested and provided to the IRS.[4] There simply was no established claim procedure, indeed, an accountant for the plans testified that "we were of the position that there was no direction as to what the claims procedure was. So everyone just had to use their own imagination as to what types of claims procedure existed." Rec. vol. VII at 118. Although the sole trustee of the plans delegated these matters to the lawyers and accountants servicing the plans, the trustee is responsible for insuring that there is a full and fair review of the decision denying a claim. 29 U.S.C. §§ 1133(2), 1132(d). The persistence of the appellants' counsel was responsible for the consideration accorded appellants' position during this *ad hoc* process.

The district court was entitled to consider these matters in determining whether the trustee's actions surrounding the termination of the plan were consistent with his duty of loyalty to plan participants. 29 U.S.C. § 1104. The trial court recognized the deficiencies concerning compliance with 29 U.S.C. § 1133, but found that appellants' position had been evaluated and that the claims were processed in good faith. Rec. vol. III at 631–32. We will not set aside these essentially factual findings. It must be remembered that the trustee was required to represent not only

---

4. Appellees maintain that the application for determination was withheld because it contained the compensation figures of all of the employees and that the relevant information contained in it had already been provided to the appellants. The trial court determined that the reason for non-disclosure was to maintain confidentiality. We are unconvinced that the appellees handled this matter correctly. Even assuming the compensation figures of all the employees were not relevant, the appellees could have redacted the figures. An IRS decision on the application for determination, which is not accompanied by any discussion of the partial termination issue, in no way constrains a district court's decision on the issue. *Bruch*, 828 F.2d at 150–51; *United Steelworkers of America v. Pension Benefit Guaranty Corp.*, 706 F.2d 1289, 1298 (3rd Cir.1983). But for the trustee to base his decision on the IRS determination of plan qualification, and then not provide the material submitted to the IRS to the appellants, violates fundamental fairness, let alone 29 U.S.C. § 1133(2). The appellants were not required to take appellees' word that there was nothing, not already obtained and relevant, contained in the application for determination. Appellants, as participants in the plans, had standing to request information concerning plan benefits. Although appellants have not relied on 29 U.S.C. § 1132(c), it provides that a district court may award up to $100 per day for failure to provide plan documents. *See Kleinhans v. Lisle Sav. Profit Trust*, 810 F.2d 618, 622 (7th Cir.1987) (to establish a violation of § 1132(c), a beneficiary must prove to district court that the trustee was required by ERISA to provide the information and that the member requested such information, but the trustee did not provide it). The penalty contained in § 1132(c) was designed to induce compliance with information requests by plan participants and beneficiaries. *Bemis v. Hogue*, 635 F.Supp. 1100, 1105–06 (E.D.Mich. 1986). When plan representatives are completely indifferent to reasonable requests for plan and benefit information, a district court, in its discretion, may impose a penalty, even absent: 1) a showing of bad faith on the part of plan representatives, and 2) a showing of prejudice caused by the lack of prompt disclosure. *Id.* at 1106.

the interests of the departing participants, but also the present participants, namely the 16 remaining employees who would benefit from a determination that no partial termination had occurred. Although the trustee was in a position to benefit from the decision that no partial termination occurred, the trial court found no evidence of an improper motive after hearing the testimony and observing the witnesses. As the trial court observed, the trustee consistently sought legal and accounting advice concerning a proper resolution of the issue.

While these deficiencies in the claim procedure cause us concern, the question of whether such omissions were prejudicial to the appellants must be addressed. *Wolfe,* 710 F.2d at 393; *Wardle v. Cent. States, SE & SW Areas Pension Fund,* 627 F.2d 820, 828 (7th Cir.1980), *cert. denied,* 449 U.S. 1112, 101 S.Ct. 922, 66 L.Ed.2d 841 (1981). On this point, the trial court found that the appellants were provided with "an opportunity to present their arguments regarding partial termination." Rec. vol. III at 625. This finding is supported by record evidence. Even under appellants' view of the case, they ultimately had access to the material facts, which they describe as "the identity and number of participants who terminated, the reason for their departure, the corporate events which led up to both the transfer to Volume by the employees as well as the sale [of Automation]." Appellants' Brief at 39. This is demonstrated by the correspondence authored by appellants' counsel contained in the record. Appellants were not provided with the application for determination submitted to the IRS, but even with this omission, we cannot say that appellants were not allowed an opportunity to present their version concerning the material facts and their legal implications to plan representatives and to the IRS.

Even though we cannot agree with the trial court that the claims procedure was legally adequate, its procedural defects do not require reversal in light of the trial court's decision, with which we agree, on the partial termination issue. Not every procedural defect will upset the decision of plan representatives. *Wolfe,* 710 F.2d at 393. The merits of the partial termination issue have been correctly resolved, no purpose would be served by a further, but procedurally correct, review of appellants' claims by the trustee. *Wardle,* 627 F.2d at 828. The decisions of the plan representatives to deny benefits will be upheld unless such decisions are "(1) arbitrary and capricious, (2) not supported by substantial evidence, or (3) erroneous on a question of law." *Peckham v. Board of Trustees of the Int'l Brotherhood of Painters and Allied Trade Unions,* 653 F.2d 424, 426 (10th Cir.1981). Appellants suggest that a higher standard is warranted in this case because it involves a trustee bypassing the interests of the beneficiaries in favor of his own interests. *See, e.g., Bruch v. Firestone Tire and Rubber Co.,* 828 F.2d at 145; *Struble v. N.J. Brewery Employees' Welfare Trust Fund,* 732 F.2d 325, 333 (3rd Cir.1984). We think that this dispute is more properly characterized as one involving the trustee's balancing of interests between present claimants (appellants) and future claimants (the remaining employees at Automation). Moreover, we agree with Judge Posner's analysis in *Van Boxel v. Journal Co. Employees' Pension Trust,* 836 F.2d 1048, 1049–53 (7th Cir.1987), that the arbitrary and capricious standard is sufficiently flexible to allow a reviewing court to adjust for the circumstances alleged, such as trustee bias in favor of a third-party or self-dealing by the trustee. Here, the decision of the trustee to deny additional benefits followed from the legal determination that no partial termination had occurred. The trustee's procedural error concerning the claims review procedure is one of law, but because it did not foreclose appellants from being heard, the district court decision on the partial termination issue will not be set aside.

■ On appeal, both parties contend that the trial court should have awarded attorney's fees and costs pursuant to 29 U.S.C. § 1132(g). The trial court declined to award such costs and attorney's fees to the appellees, finding that the appellants' position was in good faith and not without

merit. The trial court did not abuse its discretion. *Hope v. Int'l Bhd. of Elec. Workers*, 785 F.2d 826, 831 (9th Cir.1986). Appellants suggest that they are entitled to attorney fees under 29 U.S.C. § 1132(g) based on the failure of the appellees to have a claims procedure in accordance with 29 U.S.C. § 1133(2). On remand, the district court should consider this issue given our legal determination that the claims review procedure was inadequate. *See Gordon v. United States Steel Corp.*, 724 F.2d 106, 109 (10th Cir.1983) (factors to be considered in awarding attorney's fees). Should attorney's fees be awarded to appellants, such fees should be limited to the extent that appellees' noncompliance with § 1133(2) necessitated attorney's fees and costs to be incurred by appellants.

AFFIRMED IN PART, REVERSED IN PART and REMANDED.