**UNITED STATES COURT OF APPEALS**

**TENCH CIRCUIT**

MICHAEL T. BENSON,

      Plaintiff - Appellant,

v.

HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY,

      Defendant - Appellee.

No. 11-4202
(D.C. No. 2:10-CV-00275-TS)
(D. Utah)

**ORDER AND JUDGMENT**[*]

Before **MURPHY**, **HOLLOWAY**, and **O'BRIEN**, Circuit Judges.

Michael Benson (Benson) appeals from the summary judgment entered for

Hartford Life & Accident Insurance Company.  The judgment upheld Hartford's denial

of benefits under his wife's life insurance policy.  Prior to the death of Benson's wife,

Kristy, Hartford's policy administrator determined she was able to work a sedentary part-

time job.  As a result, Hartford concluded she was not totally disabled under her policy

---

[*] This order and judgment is an unpublished decision, not binding precedent. 10th
Cir. R. 32.1(A).  Citation to unpublished decisions is not prohibited.  Fed. R. App. 32.1.
It is appropriate as it relates to law of the case, issue preclusion and claim preclusion.
Unpublished decisions may also be cited for their persuasive value.  10th Cir. R. 32.1(A).
Citation to an order and judgment must be accompanied by an appropriate parenthetical
notation – (unpublished).  *Id.*

terms and terminated her life insurance premium waiver (which had been granted due to her total disability). It notified the Bensons that Kristy had thirty days to convert the policy to a personal policy and pay the premiums or her life insurance policy would be terminated. She invoked Hartford's appeal process but did not convert the policy. The administrator's decision was affirmed after a review by two independent physicians. When Kristy died several months later, Hartford denied Benson's efforts to collect benefits under the policy. Benson filed suit claiming Hartford failed to properly investigate Kristy's condition. The district court entered summary judgment in Hartford's favor. We affirm.

## BACKGROUND

The Bensons lived in Utah where Kristy had worked for Zions Bancorporation. Kristy's employment benefits included a life insurance policy and group long-term disability policy. In 1997, Kristy had a lobectomy to treat a lung infection. The surgery left her with chronic pain and depression causing her to cease working in December 1998. She was approved for Zions' long-term disability benefits under the group insurance policy administered by UNUM Insurance Company and also received disability benefits from the Social Security Administration.

Zions provided a group life insurance plan originally administered by Beneficial Insurance Company (Beneficial). The plan provided for a waiver of the life insurance premium for employees who were totally disabled. The policy defined a totally disabled employee as an:

Employee [who] is unable due to bodily injury or sickness to engage for remuneration or profit in any and every occupation or business for which he or she is or becomes reasonably suited by education, training, or experience.

(Vol. 2 at 281.) In 2001, Beneficial approved the waiver of Kristy's premium based on her total disability. Kristy provided Beneficial periodic updates on her condition from 2002 through 2005. These reports indicated her condition was chronic and without anticipated change. However, the documents indicated no impairment rating assessment had been performed to determine her ability to work.

In 2007, Hartford purchased a number of policies from Beneficial, including Kristy's. (Vol. 1 at 112.) On October 30, 2008, Kristy received a request from Hartford to provide a release of medical information and asked her to submit a "Personal Profile Evaluation." (Vol. 2 at 446.) She submitted a personal profile stating she was unable to work due to "chronic pain in nerves" from her surgery. (*Id*. at 398.) She reported she spent 12 to 15 hours in bed each day, engaged in no social activities, and her husband performed almost all household chores. She informed Hartford she received long-term employee disability benefits as well as social security disability benefits.

Kristy also identified Dr. Allen Abdulla as her only current medical provider treating her condition. He provided a statement of functionality listing her diagnosis as "COPD, LUL lobectomy," and noting, under "current subjective symptoms," a shortness of breath. (*Id*. at 402.) Abdulla did not complete the part of the form asking about functional capabilities.

Hartford followed up by sending Abdulla a "functional capacity letter" asking two questions. The first was: "Do you feel [Kristy] is currently mentally and physically capable of performing Part-time work that is: (Choose one)." (*Id.* at 391.) This question was followed by five choices ranging from "Sedentary" to "Very Heavy." (*Id.*) The second question asked: "If your patient is not capable of Part-time work, please give appropriate limitations and restrictions that would prevent [Kristy] from Part-time work and medical evidence to support this opinion, including office notes, diagnostic testing including most recent records from 1/1/2008 to the present." (*Id.* at 392.)

Abdullah answered the first question by checking the "Medium" box. This indicated he believed she was able to exert "20 to 50 pounds of force occasionally and/or 10 to 25 pounds of force frequently." (*Id.* at 391.) Abdulla did not provide an answer to the second question.

On February 20, 2009, Hartford informed Kristy she no longer met the policy's definition of disabled and was no longer eligible for the premium waiver. The letter explained her right to appeal and the process involved. It also informed her she could convert her group policy to an individual policy at her own expense. On March 4, 2009, Kristy spoke with the Hartford administrator who reviewed her claim. Kristy stated she could no longer work and the decision to terminate her policy waiver was in error. She was again advised of her right to appeal the decision terminating her premium waiver but was also told she needed to convert her policy during the appeal; if she converted the policy and the examiner's decision was reversed, her premium would be refunded. (*Id.* at 299.)

Kristy appealed but did not convert her policy. On April 21, 2009, she wrote to the administrator and said she recently spoke with Dr. Abdulla, and he believed he had "misstated [her] current condition" which he would correct if given the opportunity. (*Id*. at 376.) She also said she was unable to work part-time both physically and emotionally. Kristy submitted a new Personal Profile and Abdulla submitted an amended Attending Physician Statement of Functionality. Abdulla noted the job restrictions included on the form were not applicable because Kristy was on disability and social security.

On April 30, Hartford sent Abdullah a request for treatment notes and other information and asked:

> Do you feel that Ms. Benson has been prevented from performing any work, including part-time sedentary level work, since February 6, 2009? If yes, please advise us of any restrictions or limitations that have been placed on her activities that would preclude part-time sedentary level work.

(Id. at 369.) Abdulla answered with a copy of the same letter containing the handwritten remarks, "yes; COPD: LUL lobectomy: chronic pain." (*Id*. at 358.)

Hartford then sent Kristy's file to the University Disability Consortium (UDC) for an independent review. The file was referred to Dr. Ruffell, a psychiatrist, and Dr. Chekiri, a family medicine specialist. Both doctors reviewed the information from Beneficial and the more recent notes provided by Abdulla. Both doctors separately spoke with Abdulla by telephone. In the conversation with Ruffell, Abdulla reported Kristy's symptoms of depression to be "at worst mild." (*Id*. at 347.) He opined her mental and emotional state would not prevent her from performing if she were motivated to perform in a work setting. When Abdulla spoke with Chekiri, he said Kristy "could perform part-

- 5 -

time sedentary work, but that 40-hour per week sedentary work would likely cause excessive exertion given her pulmonary status." (*Id.* at 340.)  Both independent reviewers concluded Kristy could work part time.

Based on the file, the independent review and Abdulla's statements, Hartford denied the appeal and upheld the termination of the premium waiver on May 19, 2009. Kristy died approximately four months later, on August 27, 2009.  Benson filed a claim with Hartford for the life insurance benefits.  His claim was denied.

Benson filed this action against Hartford on March 30, 2010.  He alleged Hartford's denial of benefits violated  29 U.S.C. § 1132 of the Employee Retirement Income Security Act (ERISA).  Both Benson and Hartford filed motions for summary judgment.  The district court granted Hartford's motion.  It concluded the insurance policy vested discretion with the administrator; therefore, the review of the administrator's decision was for an abuse of discretion.  Under that standard, Hartford was not required to do more than investigate Kristy's current condition, which it did by reviewing Abdulla's records and submitting them for an independent review.  Because there was sufficient support in the record to support the conclusion Kristy could work part-time, the administrator did not act unreasonably in concluding she was not totally disabled.

A.    Standard of Review

 "[A] denial of benefits challenged under [ERISA] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."

*Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989); *see Nance v. Sun Life Assurance Co. of Canada*, 294 F.3d 1263, 1266 (10th Cir. 2002). If the plan gives the administrator or fiduciary discretionary authority to make eligibility determinations, we review its decisions under an abuse-of-discretion (or arbitrary and capricious) standard. *Metro. Life Ins. Co. v. Glenn,* 554 U.S. 105, 111 (2008); *see Weber v. GE Group Life Assurance Co.*, 541 F.3d 1002, 1010 n.10 (10th Cir. 2008) (abuse of discretion and equivalent to arbitrary and capricious standard). "An act is discretionary when a choice must be made in the exercise of judgment on what is proper under the circumstances." *Gust v. Coleman*, 740 F. Supp. 1544, 1551 (D. Kan. 1990), *aff'd*, 936 F.2d 583 (10th Cir. 1991) (unpublished).

In *Nance*, we discussed the policy language needed to trigger the abuse of discretion standard. We determined the policy's statement that "'[p]roof [of long term disability] must be satisfactory to Sun Life'," "suffice[d] to convey discretion to Sun Life in finding the facts relating to disability." 294 F.3d at 1267-68. In a footnote, however, we said:

> We should caution, however, that plan drafters who wish to convey discretion to plan administrators are ill-advised to rely on language that is borderline in accomplishing that task . . . . [A]s more and more courts emphasize the need for clear language to convey discretion, courts that have found borderline language acceptable in the past may assume that plan drafters who have not clarified the language were not intent on conveying discretion.

*Id*. at 1268 n.3.

Turning to the relevant language here, Zions' plan stated the proof of total disability must be "properly submitted to and approved by the Company." (Vol. 2 at 282.)

> Upon receipt and approval of proper proof of Total Disability, the Company will acknowledge in writing the Employee's Total Disability. Thereafter, proper proof of Total Disability must be submitted at the Employee's expense upon the Company's request.

(*Id.* at 283.)   Although Benson originally argued the plan's language did not clearly convey the administrator's discretion and required a de novo review, in his reply brief and at oral argument, Benson conceded "that under *Nance* . . . the language of the policy is sufficient to confer discretionary authority." (Appellant's Reply Br. at 10.)  He now argues we should accept *Nance's* invitation in footnote three to reassess our "comparatively liberal" construction of language that "trigger[s] the more deferential standard of review under ERISA." *Nance*, 294 F.3d at 1268.  We must decline. Accepting Benson's position, "it is well established that one panel cannot overrule the judgment of another panel of this court . . . absent en banc reconsideration or a superseding contrary decision by the Supreme Court." *Barber v. T.D. Williamson, Inc.*, 254 F.3d 1223, 1229 (10th Cir. 2001) (quotation marks omitted).  Even if we were to review the case under a de novo standard, it would not change the result in this case. Given Benson's concession that the language suffices to apply a discretionary standard under current precedent, we review Hartford's decision accordingly.  *See United States v. Huizar*, 688 F.3d 1193, 1194-95 (10th Cir. 2012) ("Because it makes no difference to the

outcome of this case, we assume without deciding the modified categorical approach may be used here.").

"Using the arbitrary and capricious standard, we ask whether the administrator's decision was reasonable and made in good faith." *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124, 1133 (10th Cir. 2011) (quotation marks omitted). "We will uphold the decision of the plan administrator so long as it is predicated on a reasoned basis, and there is no requirement that the basis relied upon be the only logical one or even the superlative one." *Id.* at 1134. Generally, "[w]e look for substantial evidence in the record to support the administrator's conclusion, meaning more than a scintilla of evidence that a reasonable mind could accept as sufficient to support a conclusion." *Id.* (quotation marks omitted).

B.    Discussion

Benson contends Hartford's conflict of interest, as well as that of its independent reviewers, caused the failure to properly investigate Kristy's condition. He also argues that, under the policy, even if Kristy was able to work part time, she continued to be totally disabled.

1.    Conflict of Interest

Benson argues Hartford's conflict of interest is of special importance when we assess the adequacy of Hartford's investigation into Kristy's medical condition. When an insurance company acts as both the administrator of a policy and the payor of benefits, one factor in the abuse of discretion analysis is the inherent conflict of interest created by the circumstances. *Metro. Life Ins. Co*, 554 U.S. at 115-16. A conflict is more important

when "circumstances suggest a higher likelihood that it affected the benefits decision," but less so when the conflicted party "has taken active steps to reduce potential bias and to promote accuracy." *Id.* at 117.

Benson claims Hartford's bias infiltrated the entire administrative decision-making process. He points to the relatively short period of time between Hartford's acquisition of the Zions policy and its re-evaluation of Kristy's ten-year-old claim. He complains Hartford knew Kristy had been receiving long-term and social security disability benefits for years, yet it did not attempt to discover the medical information supporting those benefits. Instead, it relied on Abdulla's statements and his sparse medical notes and, when she appealed, sent the inadequate file to UDC for review.

Benson also asserts UDC was biased in reviewing the records. He points to UDC's marketing materials which promised Hartford "a probable result" of its services including "[i]mproved denial and closure rates and reduced costs." (Vol. 1 at 158.) He cites several Ninth Circuit district court rulings which found "the nature of [Hartford's] relationship with [UDC] and [its] reviewing physicians creates an incentive for [UDC] to reach results that are favorable to [Hartford] in order to foster and sustain their business relationship." *Kurth v. Hartford Life & Accident Ins. Co.*, 845 F. Supp. 2d 1087, 1096 (C.D. Cal. 2012).

Although we acknowledge independent medical reviewers have an inherent incentive to please their employer, see, e.g., *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003), there is nothing in this record to indicate the review of Kristy's premium waiver was contrary to procedure or predetermined. Benson's general

allegations are insufficient to alter our deference to the administrator's decision. The time period between Hartford's acquisition of Zions' plan for administration and its review of Kristy's file was over a year–hardly a cause for raised eyebrows. Nothing in the record suggests a specific bias on the part of the administrator or the reviewing physicians. And, because each case turns on its own facts, the district court decisions Benson cites cannot establish a conflict in this case. While we consider the inherent conflict of an administrator/payor as one factor in our review, we find no reason for increased skepticism here.

2.      Investigation

At oral argument, Benson agreed the administrative record supports the conclusion that Kristy could have worked a part-time, sedentary job. However, he claims Hartford's investigation was arbitrary and capricious because it failed to inquire into the reasons for Kristy's continued eligibility for Zions' long-term disability benefits and social security disability benefits. He relies on our decision in *Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792 (10th Cir. 2004).

In *Gaither*, we reversed summary judgment in favor of Aetna because Aetna had information which should have alerted it to the claimant's total disability based on his use of prescription drugs. *Id*. at 794. Despite the obvious leads in Aetna's records concerning a disability caused by prescription narcotics, it failed to contact doctors who were treating the claimant. It then denied his claim because he had no "psychological" disability which would prevent him from working. *Id*. at 806. We concluded Aetna's denial was arbitrary and capricious because it failed to investigate the information in the

- 11 -

file supporting the specific claims of disability. *Id.* However, our decision contained this caveat:

> Nor do we suggest that the administrator must pore over the record for possible bases for disability that the claimant has not explicitly argued, or consider whether further inquiry might unearth additional evidence when the evidence in the record is sufficient to resolve the claim one way or the other.
>
> Rather, we assert the narrow principle that fiduciaries cannot shut their eyes to readily available information when the evidence in the record suggests that the information might confirm the beneficiary's theory of entitlement *and* when they have little or no evidence in the record to refute that theory.

*Id*. at 807 (emphasis added).

*Gaither* is unavailing in Benson's circumstances. Hartford looked at Beneficial's file regarding Kristy's benefits history from 2001 through 2005, the last date the file had been updated. While her former doctors opined she was being treated for chronic pain, each report specifically stated no disability assessment or functional evaluation had been performed. In 2005, the physician's report stated she was sedentary 75% to 100% of the time, but there had been no recent medical workup. The final report again recommended a formal functional evaluation to accurately determine her physical impairment. When Hartford contacted Abdulla, her only treating physician, he unequivocally stated he believed Kristy could work part-time. Given this information, it was not unreasonable for Hartford to deny her premium waiver. Hartford was under no duty to seek out her disability records because it had "evidence in the record" to refute her assertions that her pain would not allow her "to engage for remuneration or profit in any and every occupation or business . . . ." (Vol. 2 at 281.)

- 12 -

Hartford informed Kristy she no longer met the definition of totally disabled "[b]ased on the information received from Dr. Alan Abdulla." (Vol. 2 at 387.) It explained the process to appeal the decision and told her she "may submit written comments, documents, records and other information related to [her] claim." (*Id.*) The only additional information she submitted was the amended self-report and the amended report from Abdulla. While Kristy informed Hartford her pain caused her to remain in bed most of the day, her treating physician and the independent reviewers confirmed her ability to work part-time. Kristy did not submit her prior medical records or any other evidence to establish her disability.

Hartford's investigation did not violate ERISA. Its provisions were "enacted to promote the interests of employees and their beneficiaries in employee benefit plans, and to protect contractually defined benefits." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 113 (1989) (quotation marks and citations omitted). Every ERISA benefit plan must contain a two-step procedure for denying claims. *See* 29 U.S.C. § 1133. First, the plan participant must receive "adequate notice . . . setting forth the specific reasons for [a] denial." *Id.* § 1133(1). Benson does not contend the notice was inadequate. Second, the plan must "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1133(2). This full and fair review must give the claimant "the opportunity to submit written comments, documents, records, and other information relating to the claim for benefits." *Id.* This includes "knowing what evidence the decision-maker relied upon, having an opportunity to address the accuracy

- 13 -

and reliability of the evidence, and having the decision-maker consider the evidence presented by both parties prior to reaching and rendering his decision." *Sage v. Automation, Inc. Pension Plan & Trust,* 845 F.2d 885, 893-94 (10th Cir. 1988) (quotation marks omitted).

Each requirement was met here. If Kristy believed her records from earlier disability evaluations would refute the administrator's decision, she was free to submit the information to Hartford. She did not. While we do not agree with Hartford that this information was "irrelevant" to Kristy's complaint of chronic pain, Hartford was not required to seek out information refuting the opinions of Abdulla and its independent reviewers. Hartford's decision was not arbitrary and capricious.

3.      Plan Interpretation

Benson claims that even if Kristy could work part-time, she would still be considered totally disable under the terms of the policy. The policy defines "totally disabled" or "total disability" as: "the *Employee*" being unable "to engage . . . in any and every occupation or business . . ., " and "Employee" is defined as a person who works full-time." (Appellant's Br. at 29-30.) Therefore, part-time work does not disqualify an employee from being totally disabled. According to Benson, the term at least creates an ambiguity which must be construed in favor of the insured. Hartford contends "the term Employee in the Group Life Policy is the equivalent of 'Insured,' and its use in the disability definition does not modify or alter the unambiguous language of that definition concerning the requirement of disability." (Appellee's Br. at 28-29.) Both arguments miss the point. Benson's interpretation appears contrived and Hartford's response fails to

recognize that "employee" and "insured" are defined separately in the plan. (Vol. 2 at 280.)

"Where the plan administrator's decision relies on an interpretation of the language in the plan, as it does here, we begin by considering whether the provision is ambiguous; if the plan documents, examined as a whole, are unambiguous, we construe them as a matter of law." *Scruggs v. Exxonmobil Pension Plan*, 585 F.3d 1356, 1362 (10th Cir. 2009). The language in the plan here is unambiguous. The term "employee" is defined in relevant part as "a person who works full-time." (Vol. 2 at 280.) In turn, "full-time" is defined as "regular, permanent employment for not less than the number of hours specified in the Policy Schedule." (*Id.*) The Policy Schedule states: "Full-time Employment  20 hours per week." (*Id*. at 275.) Thus, the unambiguous terms of policy resolve this issue. Kristy's ability to work 20 hours per week was sufficient to qualify her as a full-time employee. Hartford's decision was not contrary to those terms.

The motion to seal Volume 2 of the record (medical records) is GRANTED and the district court's decision is AFFIRMED.

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge

- 15 -