833 F.2d 74
 56 USLW 2348, 88-1 USTC P 9319, 9
Employee Benefits Ca 1137
 Wilmont KREIS, D. David Ernst, Michael Shier, Diane
Dmytryshyn, Mary Heimbach, Cathy Folco Richards,
and Patricia Cook, Plaintiffs-Appellants,
v.
CHARLES O. TOWNLEY, M.D. & ASSOCIATES, P.C., a Michigan
professional corporation; Charles O. Townley,
M.D.; and Marjorie Ange, Defendants- Appellees.
 No. 86-1674.
 United States Court of Appeals,
Sixth Circuit.
 Argued June 12, 1987.
Decided Nov. 6, 1987.
 
 David C. Devendorf, argued, Davidson, Staiger, Adair, Hill, Mosier, Devendorf & Clyne, Port Huron, Mich., for plaintiffs-appellants.
 Stuart M. Bordman, Rubenstein, Isaacs, Lax and Bordman, Southfield, Mich., Richard C. Littlefield, argued, for defendants-appellees.
 Before MERRITT and MARTIN, Circuit Judges, and BROWN, Senior Circuit Judge.
 BAILEY BROWN, Senior Circuit Judge.
 
 
 1
 Plaintiffs-Appellants (appellants) appeal the judgment of the district court dismissing their claims under section 502(a)(1)(B) of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. Sec. 1132(a)(1)(B), for accrued unvested benefits under two employee pension benefit plans. Appellants argue that the district court erred as a matter of law in denying their claims for benefits on the ground that a "partial termination" of the pension benefit plans did not occur even though approximately one quarter of the plans' participants left the plans. For the following reasons, we affirm.
 
 
 2
 Defendant-Appellee Charles O. Townley, M.D. & Associates, P.C. (the Townley P.C.) is a Michigan professional corporation specializing in orthopedic surgery. At all relevant times, defendant-appellee Dr. Charles O. Townley (Dr. Townley) was the Townley P.C.'s sole director and president, and defendant-appellee Marjorie Ange (Ms. Ange) was its secretary.
 
 
 3
 As of early 1983, the Townley P.C. employed five physicians, appellee Dr. Townley, appellants Drs. Wilmont Kreis, Michael Shier and David Ernst, and Dr. Edward Nebel, who is not a party. All but Dr. Ernst were equal shareholders in the Townley P.C. However, Drs. Kreis and Shier held their shares subject to a stock redemption agreement providing, inter alia, that upon the termination of their employment with the Townley P.C. their shares would be redeemed. The written employment agreements between the Townley P.C. and Drs. Kreis and Shier provided that the employment relationship could be terminated only on 60-day written notice to, or from, the Townley P.C. Dr. Ernst had no stock in, and no written employment agreement with, the Townley P.C.
 
 
 4
 On or about Tuesday, February 8, 1983, Dr. Townley informed Dr. Kreis that, in his capacity as sole director and president of the Townley P.C., he, Dr. Townley, would soon fire Dr. Shier for repeatedly failing to maintain adequate records.[1] According to Dr. Kreis, Dr. Townley also stated his intention to perpetuate his complete dominion over the Townley P.C. by requiring Dr. Kreis to sell back his Townley P.C. shares and by precluding Dr. Ernst from ever purchasing Townley P.C. stock.[2] Later that same evening, Dr. Kreis discussed Dr. Townley's plans with Drs. Shier and Ernst, and the three agreed to explore the possibility of leaving the Townley P.C. together and establishing their own practice.
 
 
 5
 Three days thereafter, on Friday, February 11, 1983, both Dr. Kreis and Dr. Ernst told Dr. Townley, in separate conversations, that they wished to leave the Townley P.C. if Dr. Townley insisted upon consigning them permanently to the roles of employees rather than shareholders. Neither believed, however, that he had actually resigned, because each assumed, based on comparable past experiences, that Dr. Townley's displeasure and concomitant threats would dissipate harmlessly. Neither submitted a written resignation, and each routinely reported to work during the following week, although Dr. Kreis consulted an accountant and an attorney concerning the establishment of a new practice.
 
 
 6
 On or about February 18, 1983, both Dr. Kreis and Dr. Ernst received a letter, dated February 10, 1983, from the Townley P.C. stating, in pertinent part:
 
 
 7
 [P]ursuant to action of the Board of Directors taken on February 10, 1983 your employment with the Corporation has been terminated. This letter shall therefore serve as notice to you that your employment by the Professional Corporation will terminate sixty (60) days from the date hereof.
 
 
 8
 On several occasions thereafter, Dr. Townley discussed with Drs. Kreis and Ernst the possibility of remaining with the Townley P.C., to no avail. Drs. Kreis, Shier and Ernst ultimately decided to form a separate practice together. All three left the Townley P.C. in early May 1983.[3] In the wake of their departure, several of the Townley P.C.'s support staff left as well, including the four non-physician appellants here.
 
 
 9
 In late 1983, the seven appellants herein filed with the Townley P.C. claims for benefits under two ERISA-covered retirement pension plans in which they had voluntarily participated while affiliated with the Townley P.C.--the Townley P.C.'s Money Purchase Plan and its Defined Benefit Plan (the Plans). At all relevant times, the Townley P.C. was the administrator for both Plans, and as such was responsible for handling benefits claims thereunder.[4]
 
 
 10
 In addition to their benefits that had accrued and vested pursuant to the Plans' vesting schedules, appellants sought their accrued but unvested benefits as well.[5] As grounds for their claims, appellants relied on a provision in the Plans providing, inter alia, that upon the "partial termination" of the Plans, all accrued benefits automatically become nonforfeitable, regardless of the otherwise applicable vesting schedules. Appellants maintained that collectively their departures from the Townley P.C. and its Plans caused a "partial termination" of the Plans, entitling them to all accrued benefits, both vested and unvested.
 
 
 11
 During the first six months of 1984, appellants pursued their claims through the claims procedure delineated in the Plans. Finally, in July 1984, the administrator Townley P.C., through its president Dr. Townley, decided that a "partial termination" of the Plans had not occurred and accordingly denied appellants' claims for accrued unvested benefits.[6] The administrator Townley P.C. based its denial on the factual conclusion that all of the appellants had voluntarily resigned and on the legal conclusion that the "partial termination" inquiry hinges solely on the percentage of plan participants forcibly excluded from a plan. In response, on or about November 29, 1984, appellants filed suit in Michigan state court under section 502(a)(1)(B) of ERISA, 29 U.S.C. Sec. 1132(a)(1)(B), seeking their accrued unvested benefits. On January 15, 1985, the suit was removed to federal district court pursuant to 29 U.S.C. Sec. 1132(e)(1) (conferring to federal district courts jurisdiction over ERISA suits) and 28 U.S.C. Sec. 1441 (removal statute).
 
 
 12
 On June 24, 1986, after a bench trial, the district court issued a memorandum opinion and order dismissing appellants' claims. In so doing, the district court found that Drs. Kreis, Shier and Ernst were actually discharged, that Ms. Dmytryshyn and Ms. Cook were constructively discharged, and that Ms. Heimbach and Ms. Richards voluntarily resigned. The district court found, accordingly, that 25% of the Defined Benefit Plan's participants (5 of 20) and 22.7% of the Money Purchase Plan's participants (5 of 22) were forcibly excluded from the respective plans.[7] The district court then held as a matter of law that, under the "significant percentage" test used by the Internal Revenue Service to determine whether a "partial termination" of a qualified plan has occurred within the meaning of the Internal Revenue Code, the percentages of participants forced to leave the Plans here are not significant enough to warrant a conclusion that the Plans have "partially terminated."
 
 
 13
 This appeal presents three questions: First, by what legal standard do we determine whether a "partial termination" of the Plans occurred? Second, did the district court clearly err in finding that Drs. Kreis and Ernst were actually discharged and that Ms. Cook and Ms. Dmytryshyn were constructively discharged?[8] Third, in light of the proper legal standard and the correct percentage of forcibly excluded plan participants, did a "partial termination" of the Plans occur? We now address those questions in turn.
 
 I. The Proper Legal Standard
 
 14
 Appellants brought this action under section 502(a)(1)(B) of ERISA "to recover benefits due to [them] under the terms of [their] plan[s], [and] to enforce [their] rights under the terms of the plan[s]." 29 U.S.C. Sec. 1132(a)(1)(B). Appellants seek to enforce the terms of their Plans, which provide that "[u]pon complete or partial termination of the Plan or Trust ... the rights of all Participants to benefits accrued to the date of such termination ..., to the extent then funded, or the amounts credited to the Participants' accounts are non-forfeitable." (Emphasis added.) The parties assume and implicitly agree that the phrase "partial termination" was used in the Plans in order to incorporate the administrative and judicial interpretation of "partial termination" as it appears in the Internal Revenue Code, more precisely, in 26 U.S.C. Sec. 411(d)(3).[9] As a result, in order properly to interpret the term "partial termination" as used in the Plans, we must look to administrative and judicial constructions of 26 U.S.C. Sec. 411(d)(3).[10]
 
 
 15
 The closest approximation of a working definition of "partial termination" appears in a regulation promulgated by the Secretary of the Treasury, which provides:
 
 
 16
 Whether or not a partial termination of a qualified plan occurs ... shall be determined ... with regard to all the facts and circumstances. Such facts and circumstances include:
 
 
 17
 the exclusion by reason of a plan amendment or severance by the employer, of a group of employees who have previously been covered by the plan; and plan amendments which adversely affect the rights of employees to vest in benefits under the plan.
 
 
 18
 Treas.Reg. Sec. 1.411(d)-2(b)(1). Because it represents the interpretation of a statute by the agency responsible for administering the statute, the regulation is entitled to significant deference. See Amato v. Western Union Int'l, Inc., 773 F.2d 1402, 1415 (2d Cir.1985), cert. dismissed, 474 U.S. 1113, 106 S.Ct. 1167, 89 L.Ed.2d 288 (1986); Babb v. Olney Paint Co., 764 F.2d 240, 242 (4th Cir.1985). See also Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205, 210, 93 S.Ct. 364, 367, 34 L.Ed.2d 415 (1972). Unfortunately, the regulation's "all the facts and circumstances" test provides precious little guidance concerning precisely what facts and circumstances matter and how much.
 
 
 19
 We believe that in this particular context, there are two inquiries that must be made. The first is of the effects on the plan of the exclusion of employees from participation. The second inquiry focuses on the employer's, or more specifically, the decision maker's, motives.
 
 
 20
 The Treasury regulation's plain language, administrative interpretations thereof, and judicial precedent make clear that a significant factor in the first inquiry is the percentage of plan participants who are involuntarily excluded from the plan by the participants' employer in connection with a major corporate event. See Babb v. Olney Paint Co., 764 F.2d at 242; Weil v. Retirement Plan Admin. Comm. for the Terson Co., 750 F.2d 10, 12 (2d Cir.1984); Ehm v. Phillips Petroleum Co., 583 F.Supp. 1113, 1115 (D.Kan.1984); Wishner v. St. Luke's Hosp. Center, 550 F.Supp. 1016, 1019 (S.D.N.Y.1982); Taylor v. Food Giant, Inc. Salaried Employees Pension Plan, No. C84-253A (N.D.Ga. Nov. 30, 1984); and Revenue Rulings cited in those cases.
 
 
 21
 Appellees argue that this "significant percentage" factor is the only circumstance that we should consider. That argument lacks merit. The regulation's plain language clearly directs us to consider all the facts and circumstances, of which the percentage of excluded plan participants is but one, albeit generally the most persuasive one. See Babb v. Olney Paint Co., 764 F.2d at 243-45; Weil v. Retirement Plan, 750 F.2d at 13; Bruch v. Firestone Tire & Rubber Co., 640 F.Supp. 519, 530-31 (E.D.Pa.1986); Taylor v. Food Giant, supra. Of course, in a particular case the percentage may be so high or so low as to be determinative standing alone, see Bruch v. Firestone, 640 F.Supp. at 530-31; Ehm v. Phillips Petroleum, 583 F.Supp. at 1115-16, but as a general matter we must look beyond the mere percentages unless and until Congress or the Treasury Department provides otherwise.
 
 
 22
 We believe that it is also necessary to consider the extent to which the Plan is affected financially by the discharges. Thus, a plan may be impaired financially not only by the discharge of a significant percent of the participants but also by a discharge of those employees who had assured its financial soundness. We agree with appellants that, by itself, the percentage of employees discharged may not always state accurately the discharges' impact on the plan.
 
 
 23
 The second inquiry that is necessary in determining whether there has been a partial termination focuses on whether the decision maker, here Dr. Townley, excluded the plan participants in a predatory effort to profit from subsequent forfeitures and/or diminished contribution requirements. See Babb v. Olney Paint Co., 764 F.2d at 243-45; Bruch v. Firestone, 640 F.Supp. at 530; Wishner v. St. Luke's Hosp. Center, 550 F.Supp. at 1020. We believe the existence of such bad faith is indeed a relevant factor we should consider, because such consideration will further ERISA's goal of curbing the abuse of private retirement pension plans. See 29 U.S.C. Sec. 1001; see also Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 510, 101 S.Ct. 1895, 1899, 68 L.Ed.2d 402 (1981); Nachman Corp. v. Pension Benefit Guar. Corp., 446 U.S. 359, 362, 100 S.Ct. 1723, 1726, 64 L.Ed.2d 354 (1980). Because the focus here is on the decision maker's intent, any evidence of bad faith, which may in some instances include the size of the accrued but unvested benefits that will fall to those favored by the decision maker as a result of the dismissals, is certainly relevant. Evidence of a large windfall to such beneficiaries, however, supports but is not sufficient for a finding of bad faith.
 
 
 24
 Appellants urge that we examine a host of other factors, none of which we believe are relevant to the "partial termination" inquiry in this particular case. Appellants first point out that Dr. Townley managed the Townley P.C. autocratically, reserving for himself the controlling positions of president and sole director. From that position, Dr. Townley had unfettered discretion to discharge any of the other physicians without cause pursuant to the employment agreements and force them to redeem their stock in the Townley P.C. In appellants' view, the events in question stem from Dr. Townley's plenary power run amok in a fit of paranoia. In our view, however, the Townley P.C.'s internal governing structure, no matter how dictatorial, does not implicate any ERISA concerns. Moreover, Drs. Kreis, Ernst and Shier willingly joined the Townley P.C. knowing of the discharge and stock redemption provisions.
 
 
 25
 Appellants additionally direct our attention to the fact that the Plans' vesting schedules and benefits-computation provisions heavily favor Dr. Townley due to his higher age, compensation and seniority. We perceive nothing irregular in such arrangements, however, and appellants do not contend that the arrangements violate ERISA's detailed and carefully crafted requirements for vesting and computation of benefits. Moreover, participation in the Plans was voluntary, so if appellants believed the Plans to be intolerably inequitable they could have refused to participate and lobbied for modifications.
 
 
 26
 In sum, we do not believe that the internal structure of Townley P.C. and Dr. Townley's allegedly tyrannical reign over it, or the provisions of the Plans themselves, constitute facts and circumstances pertinent to our "partial termination" inquiry here. Accordingly, because of the particular context of this case, we will examine only the percentage of participants involuntarily excluded from the Plans, the effect of their exclusion on the Plan, and whether the Townley P.C. excluded the participants in a bad faith predatory effort to benefit Dr. Townley from diminished contributions and/or participants' forfeitures.
 
 II. District Court's Factual Findings
 
 27
 To ascertain the percentage of participants involuntarily excluded from the Plans, we must first determine how many participants were actually or constructively discharged by the Townley P.C. The questions of actual and constructive discharge are all questions of fact. As a result, we must affirm the district court's findings on those questions unless the findings are clearly erroneous. Fed.R.Civ.P. 52(a). A factual finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. See, e.g., Anderson v. City of Bessemer City, 470 U.S. 564, 573-75, 105 S.Ct. 1504, 1511-13, 84 L.Ed.2d 518 (1985); United States v. United States Gypsum, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948); Easter v. Jeep Corp., 750 F.2d 520, 522-23 (6th Cir.1984).
 
 
 28
 The district court found that Drs. Kreis and Ernst were actually (as opposed to constructively) discharged. In so finding, the district court reasoned:
 
 
 29
 Although both physicians admitted expressing deep dissatisfaction with the proposed stock transactions, neither submitted a verbal resignation. Furthermore, Dr. Kreis never submitted a written resignation, as was required by his employment agreement. Nevertheless, both doctors received termination letters....
 
 
 30
 Appellees maintain that the finding of actual discharge is clearly erroneous. In appellees' view, the doctors' statements to Dr. Townley expressing their refusal to work as employees rather than shareholders amounted to verbal resignations, especially given the facts that the doctors began to explore the mechanics of starting their own practice before receiving the termination letters, and they rebuffed Dr. Townley's entreaties to remain after receiving the termination letters.
 
 
 31
 Although appellees' interpretation of the evidence is plausible, our review of the entire record does not firmly convince us that the district court erred in rejecting it. The testimony does indeed indicate unequivocally that Drs. Kreis and Ernst told Dr. Townley in no uncertain terms of their desire to leave the Townley P.C. rather than remain as mere employees. Their credible testimony also reveals, however, that they did not intend those statements to serve as resignations, and that they believed Dr. Townley would soon reconsider and retract his demands as he had on several similar occasions in the past. Their exploration of the possibility of establishing a separate practice consisted of nothing more than preliminary discussions with an attorney and an accountant. Their rejection of Dr. Townley's plea to remain with the firm rested, according to Dr. Kreis, on Dr. Townley's humiliating pre-condition that they become minority rather than equal shareholders. Finally, Dr. Kreis never submitted a written resignation as required by his employment agreement. Therefore, we believe the district court's factual finding that the Townley P.C. actually discharged Drs. Kreis and Ernst when it sent to them letters of termination is not clearly erroneous. Consequently, we accept the district court's conclusion that, for purposes of our "partial termination" inquiry, the Townley P.C. forcibly excluded Drs. Shier, Kreis and Ernst from the Plans.
 
 
 32
 The district court also found that the Townley P.C. constructively discharged two of its support staffers, Ms. Dmytryshyn and Ms. Cook, and thus forcibly excluded them, too, from the Plans. Appellees wisely concede that the constructive discharge doctrine provides an appropriate basis for ascertaining whether participants were involuntarily excluded from the Plans, but maintain that the district court clearly erred in applying the doctrine to the circumstances of Ms. Dmytryshyn's and Ms. Cook's departure from the Townley P.C. We agree.
 
 
 33
 "[T]he constructive discharge issue depends upon the facts of each case and requires an inquiry into the intent of the employer and the reasonably foreseeable impact of the employer's conduct upon the employee.... [A] finding of constructive discharge [also] requires the determination that: '... working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.' " Held v. Gulf Oil Co., 684 F.2d 427, 432 (6th Cir.1982) (quoting Bourque v. Powell Elec. Mfg., 617 F.2d 61, 65 (5th Cir.1980)). Accord Williams v. Caterpillar Tractor Co., 770 F.2d 47, 49 (6th Cir.1985); Geisler v. Folsom, 735 F.2d 991, 996 (6th Cir.1984). "The employee's perception of his situation is judged objectively. 'An employee may not be unreasonably sensitive to his working environment. A constructive discharge arises only when a reasonable person would find conditions intolerable.' " Henry v. Lennox Indus., 768 F.2d 746, 752 n. 3 (6th Cir.1985) (quoting Johnson v. Bunny Bread Co., 646 F.2d 1250, 1256 (8th Cir.1981)).
 
 
 34
 With respect to Ms. Dmytryshyn, the district court found:
 
 
 35
 Ms. Dmytryshyn required a full-time secretarial position. Because at times there was not enough work to keep her busy with five full-time physicians on staff, she justifiably and reasonably feared having her hours cut when she found out only two doctors would be remaining. Although the physicians eventually were replaced, the office staff was apparently unaware of any plans to do so. These conditions, combined with the tense atmosphere resulting from the firing of the three doctors, made work conditions intolerable for this plaintiff, thus causing a constructive termination.
 
 
 36
 Although some evidence does support that finding, our review of the entire record definitely and firmly convinces us that the finding is mistaken.
 
 
 37
 First, Ms. Dmytryshyn never testified that she required a full-time job, and her behavior after leaving the Townley P.C. belies such a necessity. She worked full time awhile for a firm called Surgical Associates, but soon quit that job to remain at home. Later, she returned to the work force as a medical insurance biller for the new group of Drs. Kreis, Shier and Ernst, but on a part-time basis. Second, Ms. Dmytryshyn testified that she never made any efforts to find a new job. Instead, Surgical Associates contacted her, and that contact did not occur until July of 1983, approximately six months after the announcement of the doctors' departures and two months after the doctors actually left. Third, Ms. Dmytryshyn testified that no one told her that her hours would be cut or eliminated. In fact, she even testified that despite a declining workload she never really worried about keeping her job. Moreover, two of her fellow medical insurance billers[11] testified that the workload remained about the same throughout this whole episode. Thus, the record as a whole plainly reveals that the prospect of a reduced working schedule resulting from the forced departures of Drs. Kreis, Ernst and Shier did not render Ms. Dmytryshyn's job so difficult, unpleasant and intolerable as to trigger a constructive discharge. Accordingly, we hold that the Townley P.C. did not forcibly exclude Ms. Dmytryshyn from the Plans.
 
 
 38
 With respect to Ms. Cook, the district court found:
 
 
 39
 After the three physicians were fired, two transcriptionists, Ms. Cook and Laura Ange, remained to transcribe for essentially only one doctor, Dr. Nebel. Additionally, Ms. Cook was told by defendant Marjorie Ange that her hours would be drastically cut. Although she was previously contemplating resignation, the situation at hand forced her to immediately seek new employment.
 
 
 40
 Again, although some evidence does support that finding, our review of the entire record definitely and firmly convinces us that the finding is mistaken.
 
 
 41
 Ms. Cook testified that she needed full-time employment and that Ms. Ange, the staff supervisor, stated her hours would be cut upon the doctors' departure. Ms. Cook also testified, however, that she had been planning to move to Texas anyway for about a year prior to the breakup in order to be closer to her family and to escape from her ex-husband. Towards that end, Ms. Cook had visited Texas in early 1982 and made preliminary job investigations. Well before the doctors actually left, and without making any job inquiries in Michigan, Ms. Cook accepted a job offer in Texas. At the time of her departure in mid-March 1983, her hours had not been cut. Moreover, Ms. Ange testified, as did Dr. Townley, that all the staffers, including Ms. Cook, were personally assured of continued employment, and at no time were anyone's hours ever reduced. Ms. Ange also testified that the departures of Drs. Kreis, Shier and Ernst did not threaten Ms. Cook's job because Ms. Cook was the sole transcriber for Dr. Nebel; when Ms. Cook left, a replacement was sought immediately. Hence, we simply cannot agree with the district court that the forced departures of Drs. Kreis, Ernst and Shier played such a determinative and coercive role in Ms. Cook's decision to leave the Townley P.C. as to amount to a constructive discharge. Consequently, we hold that the Townley P.C. did not forcibly exclude Ms. Cook from the Plans.
 
 
 42
 Given our determination that the district court clearly erred in finding that the Townley P.C. constructively discharged Ms. Dmytryshyn and Ms. Cook, we must recalculate the percentage of participants involuntarily excluded from the Plans. Of the Defined Benefit Plan's participants, 15% (3 of 20) were involuntarily excluded, and of the Money Purchase Plan's participants, 13.6% (3 of 22) were involuntarily excluded.
 
 
 43
 III. Applying the Proper Law to the Correct Facts
 
 
 44
 On their faces, the figures of 15% and 13.6% do not appear compelling. Administrative decisions and case law serve to confirm that facial appearance. The lowest percentage deemed to be sufficient to warrant a finding of partial termination is 34%, see Tipton & Kalmbach, Inc. v. Commissioner, 83 T.C. 154 (1984), and three of the highest percentages deemed to be insufficient to warrant a finding of partial termination are 16.7%, see Wishner v. St. Luke's Hosp., 550 F.Supp. at 1019 (citing IRS special ruling), 13%, see Taylor v. Food Giant, supra, and 12.4%, see Babb v. Olney Paint Co., supra. Moreover, ERISA requires a plan administrator to notify the employer about the departure of plan participants only if such departure involves at least 20% of the total number of plan participants. See 29 U.S.C. Sec. 1343(b)(3). Therefore, we believe that the percentages here do not counsel strongly in favor of finding a partial termination.
 
 
 45
 Although appellants are correct that calculating the percentage of participants excluded without reference to the size of their contributions understates the impact of their exclusions on the plans, there is insufficient evidence in this case to find that the plans were significantly impaired financially by the loss of their contribution. Moreover, the figures of 13.6% and 15% are simply insufficient; significantly higher percentages are needed before the amount of contributions could affect the outcome of the "partial termination" inquiry.
 
 
 46
 Appellants point out that under the Plans the forfeitures resulting from the discharges served to reduce the Townley P.C.'s future contributions to the Plans; therefore, as Townley P.C.'s 50% shareholder (after the discharges), sole director and president, the discharges indirectly inured to Dr. Townley's financial benefit. Appellants do not contend, however, that Dr. Townley discharged the doctors in order to reap an indirect financial windfall from the Plans at the doctors' expense. There is simply no evidence that Dr. Townley's discharge of the doctors stemmed from an improper predatory motive with respect to the Plans.
 
 
 47
 In sum, the percentages involved here are facially unpersuasive and there are insufficient other facts and circumstances present to bolster appellants' cause. We are unable to find evidence of a predatory motive that can support a finding of bad faith. As a result, we hold that no partial termination of the Plans occurred. Accordingly, we AFFIRM the district court's dismissal of appellants' claims for accrued unvested benefits.
 
 
 
 [1]
 Shortly thereafter, the Townley P.C. terminated Dr. Shier pursuant to the written notice requirements of the employment agreement
 
 
 [2]
 Dr. Townley did not directly dispute Dr. Kreis' version of the conversation. Dr. Townley testified that he could not recall discussing the issue of stock ownership and that he "might have said something that made [Dr. Kreis] think that" he planned to retain Drs. Kreis and Ernst only as mere employees rather than as shareholders
 
 
 [3]
 Because Drs. Kreis, Ernst and Shier experienced logistical difficulties in establishing their new practice, Dr. Townley, as sole director and president of the Townley P.C., permitted them to remain with the Townley P.C. beyond the sixty-day notice period specified in the written employment agreement
 
 
 [4]
 See 29 U.S.C. Sec. 1002(16)(A) (defining "administrator")
 
 
 [5]
 Appellants claimed accrued unvested benefits as follows: Defined Benefit Plan: Dr. Kreis--$23,502.00; Dr. Shier--$20,554.00; Dr. Ernst--$11,245.00; Ms. Dmytryshyn--$755.00; Ms. Heimbach--$915.00; Ms. Richards--$975.00; Ms. Cook--$812.00; Money Purchase Plan: Dr. Kreis--$0.00; Dr. Shier--$0.00; Dr. Ernst--$22,580.00; Ms. Dmytryshyn--$1,786.00; Ms. Heimbach--$1,216.00; Ms. Richards--$2,754.00; Ms. Cook--$1,937.00
 
 
 [6]
 The administrator Townley P.C. promptly paid the claimed accrued vested benefits
 
 
 [7]
 In actuality, the district court found that five is 23.7% of 22. Simple arithmetic reveals the clear error of that finding. Therefore, in the text we attribute to the district court the correct calculation of 22.7%. Remarkably, the parties failed to notice the plain mathematical mistake, perhaps because they made it themselves in pre-trial filings. As revealed by our later discussion, the district court's minute computational error is insignificant
 
 
 [8]
 Appellants do not challenge the district court's determination that Ms. Heimbach and Ms. Richards voluntarily resigned. Appellees do not challenge the district court's determination that Dr. Shier was actually discharged
 
 
 [9]
 26 U.S.C. Sec. 411(d)(3) provides, in pertinent part: "[A] trust shall not constitute a qualified trust ... unless the plan of which such trust is a part provides that ... upon its termination or partial termination ... the rights of all affected employees to benefits accrued to the date of such termination [or] partial termination ..., to the extent funded as of such date, or the amounts credited to the employees' accounts, are nonforfeitable."
 
 
 [10]
 It is important to note that, in the absence of agreement between the parties that the use of the term "partial termination" in the Plans was meant to adopt the "partial termination" standards in the Internal Revenue Code, the Internal Revenue Code standards might be irrelevant. See United Steelworkers of America v. Harris & Sons Steel Co., 706 F.2d 1289, 1297-99 (3d Cir.1983)
 
 
 [11]
 Donna Glenn and Nancy Ganley