913 F.2d 1045
 66 A.F.T.R.2d 90-5941, 91-1 USTC P 50,025,
12 Employee Benefits Ca 2345
 Warren WEIL and Maria Galuppo, Plaintiffs-Appellees, Cross-Appellants,
v.
RETIREMENT PLAN ADMINISTRATIVE COMMITTEE OF THE TERSON CO.,
INC., The Terson Co., Inc., The Northern Trust Co., as
Trustees of the Terson Co., Inc. Salaried Retirement Plan,
Defendants-Appellants, Cross-Appellees.
 Nos. 1126, 1239, Dockets 89-9223, 89-9255.
 United States Court of Appeals,
Second Circuit.
 Argued April 19, 1990.
Decided Sept. 13, 1990.
 
 Ellen S. Mendelson, New York City (Sidney Eagle, Eagle & Fein, P.C., and Rachel J. Minter, New York City, of counsel), for Plaintiffs-Appellees, Cross-Appellants.
 Logan T. Johnston, Phoenix, Ariz. (Johnston, Maynard, Grant & Parker, Phoenix, Ariz., Richard W. Cutler, New York City, of counsel), for Defendants-Appellants, Cross-Appellees.
 Before MESKILL, CARDAMONE and PIERCE, Circuit Judges.
 PIERCE, Senior Circuit Judge:
 
 
 1
 Defendants appeal from a judgment of the United States District Court for the Southern District of New York (Lumbard, C.J., sitting by designation) holding that the Retirement Plan for Salaried Employees of The Terson Company, Inc. ("Plan") was partially terminated within the meaning of 26 U.S.C. Sec. 411(d)(3) (1988) when 33.4% of the Plan participants were discharged in 1981 from their jobs with The Terson Company, Inc. ("Terson"). This is the second time this case is before us. In the first appeal, Weil v. Retirement Plan Admin. Comm. for the Terson Co., 750 F.2d 10 (2d Cir.1984) ("Weil I "), familiarity with which is assumed, we reversed the late Judge MacMahon's grant of summary judgment in favor of defendants, concluding that the record contained insufficient evidence to allow a determination as to whether the Plan was partially terminated. Following our remand, further discovery ensued and a bench trial resulted in a determination in favor of plaintiffs.
 
 
 2
 In this appeal, defendants contend that the district court, in determining whether a partial termination occurred, should have considered only the percentage of terminated participants whose pension benefits had not yet vested, and that the court erred by considering terminated vested participants as well. Our opinion in Weil I did not discuss the question of whether a partial-termination inquiry should focus solely on non-vested participants. Informed by a fuller record, we now address the issue and conclude that, on the facts of this case, the district court should have considered only the percentage of terminated non-vested participants. In light of this conclusion, we believe the Plan was not partially terminated when 16.4% of the non-vested participants were discharged from their jobs. Our determination that the district court's judgment must be reversed requires that we set aside the court's award of attorneys' fees, costs and disbursements.
 
 
 3
 * Plaintiffs Warren Weil and Maria Galuppo were employed in the candy division of Ward Foods, Inc. ("Ward") from 1973 until 1981. During this time, plaintiffs participated in the Retirement Plan for Salaried Employees of Ward Foods, Inc.[1] Prior to January 1, 1979, the Plan required employees to contribute a percentage of their earnings to the Plan's fund in order to participate. The Plan provided that pension benefits would vest only after an employee had completed ten years of service. If a participant ended her employment before her vesting date, she was entitled only to a return of her contributions plus interest. However, in the event that the Plan was "partially terminated" before a participant had completed ten years of service, the Plan entitled a participant to full vesting of pension benefits to the extent funded. This vesting requirement was a condition of the Plan's qualification for favorable tax treatment under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. Secs. 1001-1461 (1988).
 
 
 4
 On December 31, 1980, Terson acquired Ward. As part of a reorganization effort, Terson relocated Ward's candy and corporate divisions from New York to Milwaukee and Chicago, respectively. A number of other divisions were closed or sold. This reorganization resulted in the termination in 1981 of over one hundred of the Plan's 395 participants, including the plaintiffs. At the time of their discharge, plaintiffs had not completed ten years of service, and thus they were not entitled to vested benefits unless the Plan was deemed to have been partially terminated. The Retirement Plan Administrative Committee of The Terson Company, Inc. ("Committee") determined that a partial termination had not occurred in 1981, and therefore they denied plaintiffs' claims for vested benefits.
 
 
 5
 Plaintiffs subsequently brought an action in the United States District Court for the Southern District of New York for a declaratory judgment that Terson's discharge of a significant number of employees constituted a partial termination of the Plan, thereby entitling plaintiffs to vesting of their benefits. On cross-motions for summary judgment, the district court held that the percentage of employees terminated did not indicate a partial termination given an absence of other supporting facts or circumstances. Weil v. Retirement Plan Admin. Comm. of the Terson Co., 577 F.Supp. 781, 783 (S.D.N.Y.1984). In reversing the district court's judgment, we adopted the view of the Internal Revenue Service ("IRS") that a "dismissal of a 'significant number of employees' in connection with a major corporate event constitutes a partial termination." Weil I, 750 F.2d at 12 (emphasis omitted). We identified two issues for further development on remand: (1) whether a substantial number of the Plan participants in 1981 voluntarily left their employment or were dismissed for reasons unrelated to the Terson reorganization, and (2) whether employee terminations in 1980 were related to Terson's acquisition and reorganization of Ward. Id. at 13.
 
 
 6
 Following a two-day bench trial, Judge Lumbard, to whom the case had been reassigned, found that most of the participants who left Terson in 1981 were essentially terminated as a result of Terson's reorganization of Ward and that employee terminations in 1980 were unrelated to Terson's acquisition of Ward. Further, he concluded that Terson's reorganization of Ward qualified as a "major corporate event" for purposes of determining if a partial termination had occurred.
 
 
 7
 On the question of whether a significant percentage of employees were terminated, the district court seemed inclined to consider simply the percentage of terminated non-vested participants since only the employer contributions of these participants were forfeited as a result of their discharge. In 1981, only 16.4% of the 395 Plan participants fell in the category of terminated non-vested participants. Nonetheless, because Judge Lumbard believed that our opinion in Weil I had tacitly rejected the distinction between vested and non-vested terminated participants, and because he believed that the prevailing approach of other courts and the IRS drew no such distinction, he considered the total percentage of both vested and non-vested terminated participants. He concluded that "a partial termination of the plan took place in 1981 when 33.4% of the plan participants were terminated in connection with Terson's acquisition and reorganization of Ward foods."
 
 
 8
 In an Order and Judgment dated November 14, 1989, the district court ordered defendants to purchase annuities sufficient to provide benefits to plaintiffs equivalent to the actuarial present value of their benefits. Moreover, the court awarded attorneys' fees, costs and disbursements to plaintiffs under 29 U.S.C. Sec. 1132(g)(1) (1988), plus post-judgment interest. The district court subsequently stayed its judgment pursuant to Fed.R.Civ.P. 62(d) conditioned upon defendants' filing of a supersedeas bond. The present appeal followed.
 
 II
 
 9
 As an initial argument, defendants contend that the district court erred in reviewing de novo the Committee's decision that no partial termination of the Plan had occurred. Defendants maintain that the correct standard of review should have been whether the Committee acted arbitrarily and capriciously in determining whether plaintiffs were entitled to benefits under the Plan.
 
 
 10
 The Supreme Court recently clarified the standard of review applicable to an ERISA plan administrator's denial of benefits. In Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989), the Court, looking to principles of trust law, held that "a denial of benefits challenged under [ERISA] is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."
 
 
 11
 Here, it is undisputed that the Plan gave the Committee discretionary authority to determine eligibility for benefits and to interpret the Plan. Under the Plan, the Committee was empowered "to decide all questions concerning the Plan and the eligibility of any Employee to Participate in the Plan." It further provided that the Committee was to "interpret the Plan, its interpretation thereof in good faith to be final and conclusive...."Nonetheless, the Committee's decision to deny benefits to plaintiffs was unique in that it turned on a question of law. Article III(26) of the Plan explicitly defines partial termination "within the meaning of Section 411 of the Internal Revenue Code." When an eligibility determination by plan administrators turns on a question of law, courts have not hesitated to apply a de novo standard of review. See Sage v. Automation, Inc. Pension Plan and Trust, 845 F.2d 885, 890 (10th Cir.1988) (whether partial termination has occurred is a question of law subject to de novo review); Bruch v. Firestone Tire and Rubber Co., 828 F.2d 134, 148-49 (3d Cir.1987) (same), aff'd in part and rev'd in part on other grounds, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). We agree that the determination by plan administrators as to whether a partial termination has occurred is not subject to deference, and, accordingly, we conclude that the district court properly reviewed the Committee's denial of benefits to plaintiffs under a de novo standard of review.
 
 III
 
 12
 Next, we consider defendants' claim that the district court erred in finding that the Plan was partially terminated in 1981. First, we briefly review the development of the provisions governing partial terminations.
 
 
 13
 * The original provision governing partial terminations, 26 U.S.C. Sec. 401(a)(7), was enacted as part of the Self-Employed Individuals Tax Retirement Act of 1962, Pub.L. No. 792, Sec. 2(2), 76 Stat. 809 (1962) (amended 1974). The legislative history to this provision indicates that Congress intended to "preclude[ ] the possibility that contributions for employees which have been deducted [by an employer] for income-tax purposes may revert back to the employer." H.R.Rep. No. 378, 87th Cong., 1st Sess., reprinted in 1962-3 C.B. 261, 269. Accordingly, for a pension plan to qualify for favorable tax treatment, Sec. 401(a)(7) required the plan to provide that "upon its termination ... the rights of all employees to benefits accrued to the date of such termination ... to the extent then funded, or the amounts credited to the employees' accounts are nonforfeitable." Pub.L. No. 792, Sec. 2(2), 76 Stat. 809, 809-10 (1962) (amended 1974). The term "termination" was construed by the Treasury Regulations to include both a partial termination and a complete termination of a plan. Treas.Reg. Sec. 1.401-6(b)(2) (1963).
 
 
 14
 In 1974, Congress enacted as part of the ERISA legislation Sec. 411(d)(3), which explicitly requires immediate vesting of benefits upon partial termination of a plan. 26 U.S.C. Sec. 411(d)(3). A primary objective of ERISA was "to make sure to the greatest extent possible that those who do participate in [pension] plans actually receive benefits...." H.R.Rep. No. 807, 93rd Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. & Admin.News 4670, 4676-77. Thus, for a pension plan to qualify for preferential tax treatment, Sec. 411(d)(3) requires a plan to provide that upon its partial termination "the rights of all affected employees to benefits accrued to the date of such ... partial termination, ... to the extent funded as of such date, or the amounts credited to the employees' accounts, are non-forfeitable."
 
 
 15
 Although Sec. 411(d)(3) does not explicitly define "partial termination," both the House and Senate Reports state that a partial termination might occur when there is "a large reduction in the work force." H.R.Rep. No. 807, 93rd Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. & Admin.News 4670, 4731; S.Rep. No. 383, 93rd Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. & Admin.News 4890, 4935. For further guidance as to the meaning of the term "partial termination," we have looked to the regulations and rulings of the IRS. We accord "great weight" to these regulations and rulings since the IRS is the agency responsible for administering the partial termination statute. Amato v. Western Union Int'l, Inc., 773 F.2d 1402, 1415 (2d Cir.1985), cert. dismissed, 474 U.S. 1113, 106 S.Ct. 1167, 89 L.Ed.2d 288 (1986); Weil I, 750 F.2d at 12.
 
 
 16
 The applicable regulations of the Secretary of the Treasury provide that whether a partial termination has occurred is to be determined on the basis of "all the facts and circumstances." Treas.Reg. Sec. 1.411(d)-2(b)(1) (1977); id. Sec. 1.401-6(b)(2) (1963). Several revenue rulings applying this standard established that there must be both a significant decrease in the percentage or number of plan participants, and a significant change in an employer's business operations for a partial termination to occur. See Rev.Rul. 73-284, 1973-2 C.B. 137; Rev.Rul. 72-510, 1972-2 C.B. 223, superseded, Rev.Rul. 81-27, 1981-1 C.B. 228.
 
 
 17
 Recently, courts have attempted to further clarify the factors relevant to a partial termination inquiry. For example, in Kreis v. Charles O. Townley, M.D. & Assoc., 833 F.2d 74, 80 (6th Cir.1987), the Sixth Circuit considered the "extent to which the Plan is affected financially by the discharge[ ]" of participants and "whether the [employer] excluded the plan participants in a predatory effort to profit from subsequent forfeitures and/or diminished contribution requirements." There, the court held that the exclusion of 15% and 13.6% of the participants from two benefit plans did not constitute a significant percentage, when there was insufficient evidence to show that the plans were significantly affected financially by the loss of contributions, and when there was no evidence that the discharge of the employees stemmed from an improper predatory motive. Id. at 83; cf. Bruch, 828 F.2d at 151 ("partial termination should be found under Sec. 411(d)(3) only if so many people have been terminated that the plan appears to have been created as a mechanism for deferring the recognition of income").
 
 B
 
 18
 With this background in mind, we turn to an issue not yet addressed by our court, namely, whether in determining if a partial termination has occurred we should consider only those terminated participants whose benefits have not fully vested.
 
 
 19
 Plaintiffs cite several cases and revenue rulings in support of their argument that both vested and non-vested participants should be counted in calculating the relevant figures. In two of these cases, the total percentage of terminated participants was so low that there was no need for the courts to distinguish between vested and non-vested employees in considering whether a significant percentage of employees were terminated. See Ehm v. Phillips Petroleum Co., 583 F.Supp. 1113, 1116 (D.Kan.1984) (2.5%); Wishner v. St. Luke's Hosp. Center, 550 F.Supp. 1016, 1019 (S.D.N.Y.1982) (3.7%). Moreover, the revenue rulings cited by plaintiffs provide little support for their position insofar as these rulings do not indicate whether the distinction between vested and non-vested participants was at issue in those rulings. See Rev.Rul. 81-27, 1981-1 C.B. 228; Rev.Rul. 73-284, 1973-2 C.B. 137; Rev.Rul. 72-439, 1972-2 C.B. 223. Further, plaintiffs rely upon Tipton & Kalmbach, Inc. v. Commissioner, 83 T.C. 154 (1984), in which the Tax Court found that a partial termination occurred when 34% and 51% of plan participants were discharged during two tax years. We find Tipton inapposite because it appears that all of the discharged employees in that case may have had non-vested benefits, id. at 161, and thus there would have been no distinction for the Tax Court to make between vested and non-vested participants.
 
 
 20
 As the district court herein recognized, it "seems logical" to consider only non-vested participants in determining whether a partial termination has occurred, since these are the employees whose pension benefits are most affected by a termination. Vested participants who are discharged also are affected in that they are not eligible for future employer contributions. Nonetheless, the legislative history of the partial termination provisions suggest that one of Congress's concerns was to prevent the forfeiture of unvested pension benefits, see Tipton, 83 T.C. at 160-61, and we do not believe that Congress also intended to insure future plan participation for those whose benefits already had fully vested.
 
 
 21
 Moreover, to the extent that the partial termination rules are designed to prevent employers from creating pension plans for the purpose of evading tax liability, Bruch, 828 F.2d at 151; see Kreis, 833 F.2d at 80, this interest would not seem to be implicated with respect to participants whose benefits have completely vested. Once a participant's pension benefits have fully vested, an employer's tax deductible contributions for that participant cannot revert back to the employer if the participant is discharged. Hence, we think it unlikely that the termination of fully vested participants would be part of a scheme to evade tax liability.
 
 
 22
 In deciding whether to consider the percentages of vested participants, we also find significance in a letter ruling from the IRS to Ward. In 1981 Ward applied to the IRS for a determination as to whether a partial termination of the Plan had occurred during 1975-80 because of Ward's discharge of participants during these years. The IRS responded that no partial termination had occurred because the percentage of participants discharged with non-vested benefits was too small, the largest percentage in a given year being 15%. The clear import of this determination letter is that the IRS was primarily concerned with the percentage of non-vested participants in determining whether a partial termination had occurred.[2] "Although such written 'determination letters' by the IRS ... 'may not be used or cited as precedent,' I.R.C. Sec. 6110(j)(3), they are entitled to some weight." Amato, 773 F.2d at 1412-13.
 
 
 23
 The deposition testimony of IRS Agent Chester Lamar confirmed that the IRS, in examining the percentage of terminated participants, focuses on the percentage of participants discharged without vested benefits. Although, as plaintiffs note, the IRS in their 1984 amicus brief in this case drew no distinction between vested and non-vested employees, in light of Lamar's deposition testimony, we decline to attach any significance to the IRS's earlier silence on the question.
 
 
 24
 In view of the foregoing, we are persuaded that, on the facts of this case, only the percentage of non-vested participants should have been considered in determining whether a partial termination occurred.[3] It is undisputed that those participants with vested benefits at the time of their discharge did not forfeit these benefits. As previously noted, we do not believe that employees whose pension benefits have fully vested are within the class of persons that Congress intended to protect with the partial termination provisions, and hence the district court should not have considered them in reaching its decision.
 
 C
 
 25
 Focusing only on the 16.4% of terminated non-vested participants, we conclude that a partial termination did not occur. Although we agree with the district court that Terson's reorganization of Ward qualified as a major corporate event, the discharge of 16.4% of the non-vested participants in connection with this event did not qualify as a significant percentage on the facts presented.
 
 
 26
 The "significant percentage" test operates to balance Congress's competing concerns in regulating pension plans. On the one hand, Congress sought to protect the pension benefits of employees and to prevent the use of pension plans as a tax avoidance scheme. These interests are implicated when the discharge of plan participants results in the forfeiture of pension benefits, inuring to the benefit of the employer. On the other hand, Congress wanted to encourage the creation of private pension plans by minimizing the costs to employers. See H.R.Rep. No. 533, 93rd Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. & Admin.News 4639, 4640; H.R.Rep. No. 807, 93rd Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. & Admin.News 4670, 4671. Such costs are potentially reduced if an employer may require an employee to have a minimum number of years of service before the employee's benefits vest. Accordingly, under the "significant percentage" test, while the discharge of a small percentage of unvested plan participants normally should not be considered a partial termination, at some point the percentage becomes sufficiently large that a partial termination should be deemed to have occurred.
 
 
 27
 Although there is no "magical figure at which a partial termination occurs," Bruch v. Firestone Tire and Rubber Co., 640 F.Supp. 519, 530 (E.D.Pa.1986), aff'd in part and rev'd in part, 828 F.2d 134 (3d Cir.1987), aff'd in part and rev'd in part, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the Treasury Department's "Plan Termination Standards," which are used by IRS agents to determine if a partial termination has occurred, provide a useful guide. The Standards suggest that a discharge of 20% of a plan's participants, "where the 20% represented the elimination of a division [or] a plant closing," might result in a partial termination. IRS Document 6678 (4-81), Explanation for Worksheet, Form 6677. Here, when only 16.4% of the non-vested participants were terminated in connection with a corporate reorganization, we think the burden was on the plaintiffs to present evidence of additional factors that weighed in favor of finding a partial termination. No evidence was presented that Terson reorganized Ward in an attempt to evade its pension obligations or that Terson employed the Plan for tax avoidance purposes. Under these circumstances, we conclude that the percentage of non-vested participants discharged was not significant enough for a partial termination to have occurred. Cf. Kreis, 833 F.2d at 83 (13.6% and 15% did not constitute a significant percentage); Morales v. Pan American Life Ins. Co., 718 F.Supp. 1297, 1303 (E.D.La.1989) (15.3% did not constitute a significant percentage).
 
 IV
 
 28
 Our reversal of the district court's finding of a partial termination also requires that we vacate the award of attorneys' fees, costs and disbursements under 29 U.S.C. Sec. 1132(g)(1). In Miles v. New York State Teamsters Conference Pension and Retirement Fund Employee Pension Benefit Plan, 698 F.2d 593, 599-601 (2d Cir.), cert. denied, 464 U.S. 829, 104 S.Ct. 105, 78 L.Ed.2d 108 (1983), we found erroneous the district court's determination that certain decisions of the trustees of a pension plan were arbitrary and capricious. Consequently, we vacated an award of attorneys' fees for plaintiffs noting that "[a]lthough success on the merits is not, in theory, indispensable to an award of attorneys' fees under 29 U.S.C. Sec. 1132(g)(1), rarely will a losing party in an action ... be entitled to fees." Id. at 602 (footnote omitted). We further observed that at least three of the five factors examined in reviewing requests for attorneys' fees under Sec. 1132(g)(1) are affected by success on the merits. Id.
 
 
 29
 Since an attorney's failure to obtain relief under ERISA generally precludes an award of attorneys' fees under Sec. 1132(g)(1), see Fase v. Seafarers Welfare and Pension Plan, 589 F.2d 112, 116 (2d Cir.1978), we believe that the award of attorneys' fees, costs and disbursements to plaintiffs must be set aside.
 
 V
 
 30
 For the foregoing reasons, we reverse the judgment of the district court declaring the Plan to be partially terminated, declaring the rights of Weil and Galuppo vested and nonforfeitable, and ordering defendants to purchase annuities to provide benefits for Weil and Galuppo. We vacate the award of attorneys' fees, costs and disbursements.
 
 
 
 [1]
 The name of Ward's pension plan was subsequently changed to the Retirement Plan for Salaried Employees of The Terson Company, Inc. following Terson's acquisition of Ward
 
 
 [2]
 To request a determination from the IRS as to whether a pension plan has partially terminated, an employer must submit a Form 5310. The form specifically asks an employer to provide, in addition to the total number of terminated participants, the number of participants terminated without full vesting. We think the information requested by Form 5310 provides further evidence that the IRS focuses on the number of non-vested participants when determining whether a partial termination has occurred
 
 
 [3]
 We recognize that situations may arise when it will be relevant to consider vested participants in determining whether a partial termination has occurred. For example, some pension plans employ a form of graduated vesting, whereby a participant's benefits vest twenty-five percent after five years of service, increasing to full vesting after fifteen years of service. See 26 U.S.C. Sec. 411(a)(2)(B). With such plans it may be relevant to consider discharged participants whose benefits have only partially vested. This is not an issue herein because Ward's Plan called for 100% vesting after ten years of service. See id. Sec. 411(a)(2)(A)