Om AGGARWAL, Guy Isidore, Robert Lee, Gerard Prosper, et al., Plaintiffs,

v.

ST. BARNABAS HOSPITAL, Employees Retirement Plan of St. Barnabas Hospital and Affiliates, the Retirement Plan Committee of the Employees Retirement Plan of St. Barnabas Hospital and its Affiliates, and The Bank of New York, Defendants.

No. 02 Civ. 428(JSR).

United States District Court, S.D. New York.

May 9, 2003.

---

Richard M. Betheil, Pryor, Cashman, Sherman & Flynn, L.L.P., New York City, for plaintiffs.

Andrew Irving, Bryan Cave LLP, New York City, for defendants.

## MEMORANDUM ORDER

RAKOFF, District Judge.

By this lawsuit plaintiffs—physicians formerly employed by defendant St. Barnabas Hospital ("St.Barnabas") at Lincoln Medical and Mental Health Center ("Lincoln") in the South Bronx—seek benefits under the Employee Retirement Income Security Act of 1974, 29 U.S.C.A. §§ 1001–1461 (1999) ("ERISA"), contending that when their former employer terminated their and others' employment it constituted a "partial termination" of St. Barnabas'

employee pension plan, an event that would entitle them to benefits that were otherwise forfeited by their termination. Following the completion of discovery and the dismissal on consent of the Fourth Count of the Amended Complaint, defendants moved for summary judgment on the remaining three claims.

The relevant facts, either as undisputed or, where disputed, taken most favorably to plaintiffs, are as follows. Lincoln is operated by the New York City Health and Hospitals Corporation ("HHC"), a public benefit corporation that contracts with medical schools, physician groups, and other hospitals to provide services at its facilities. Beginning in 1993, or even earlier, St. Barnabas sought to be considered by HHC as a contractual provider of medical services. *See* Deposition of Ronald Gade, sworn to Aug. 16, 2002 ("Gade Dep."), at 21–22, 24; Deposition of John Maher, sworn to Aug. 12, 2002, at 72.

In November 1996, St. Barnabas won an HHC bidding auction to provide medical services at Lincoln from July, 1997 through June, 2000 at a cost to HHC of about $30 million a year. Specifically, St. Barnabas was responsible for hiring and managing 250 employees (physicians and others) to serve the medical needs of the hospital's patients. *See* Declaration of Jay P. Warren, dated Sept. 17, 2002 ("Warren Decl."), HHC Ex. 3 at JM189; Plaintiffs' Local Rule 56.1 Statement ("Pls.' L.R. 56.1 St.") ¶ 11. Although a final written contract was never executed, the parties proceeded on the basis of agreed-to "deal points." *See* Warren Decl., HHC Ex. 3 at JM200.

About a year later, in November, 1997, St. Barnabas entered into a much larger agreement with HHC to provide various services from January, 1998 through December, 2000 to inmates in the custody of the New York City Department of Correc-

tion housed at Rikers Island and two other facilities (together, "Rikers") for a fee of roughly $100 million per year and involving the hiring of some 1,100 employees. Whereas, at Lincoln, St. Barnabas' services consisted essentially of management of hospitalization services similar to those it performed at its own facility, at Rikers, St. Barnabas was responsible for servicing all the medical, mental health, dental, and ancillary needs of the prison inmates *except* for hospitalization, which was provided elsewhere and by others. *See* Declaration of Ronald Gade, dated Sept. 14, 2002 ("Gade Decl.") ¶ 21; Warren Decl., HHC Ex. 39 at AM4439–43; Defendants' Local Rule 56.1 Statement ("Defs.' L.R. 56.1 St.") ¶ 27; Pls.' L.R. 56.1 St. ¶¶ 13, 58.

Employees hired by St. Barnabas, whether for work at Lincoln, at Rikers, or elsewhere, were eligible for participation in the pre-existing Employees' Retirement Plan of St. Barnabas Hospital and Affiliates (the "Plan"). Amended Complaint Ex. A. The Plan requires five years of employment before benefits vest. In December, 1999, however, St. Barnabas informed HHC that it would not extend its affiliation at Lincoln beyond the agreed-to three-year period. Two months later, in February, 2000, St. Barnabas informed HHC that it would likewise terminate the Rikers affiliation at the end of its three-year term. When, as a result, certain employees hired for the Lincoln and Rikers programs, respectively, were let go after three years, the pension contributions that had been made on their behalf were forfeited to the Plan. Plan, art. III, § 6(a).

The instant plaintiffs, all of whom worked at Lincoln (and none at Rikers), challenge that result and seek to recover the pension contributions made on their behalf. To this end, they claim (in the first two counts of the Amended Com-

plaint) that their discharge was pursuant to a "partial termination" of the Plan, in which case, under ERISA, their benefits would vest regardless of their discharge. Specifically, in order to qualify for the favorable tax treatment here obtained by the Plan, such a plan must provide that, "upon its termination or partial termination, ... the rights of all affected employees to benefits accrued to the date of such termination ... are nonforfeitable." 26 U.S.C.A. §§ 401(a)(7), 411(d)(3) (2002); *see also* Plan, art. VIII, § 4, art. XI, § 3.

■ A partial termination occurs upon "the dismissal of a 'significant number of employees' in connection with a major corporate event," *Weil v. Ret. Plan Admin. Comm.*, 750 F.2d 10, 12 (2d Cir.1984) (*"Weil I"*) (italics omitted), *quoted in* 913 F.2d 1045, 1048 (2d Cir.1990) (*"Weil II"*), *vacated in part on other grounds*, 933 F.2d 106 (2d Cir.1991) (*"Weil III"*). While there is no absolute measure of what number of employees is considered "significant" for these purposes, the rule of thumb, plaintiffs concede, is 20%, and, indeed, plaintiffs have pointed to no case in which a percentage of less than 20% was considered significant for these purposes absent exceptional or "egregious" circumstances. *See Halliburton Co. v. Commissioner*, 100 T.C. 216, 237–38, 250–51, 1993 WL 83409 (1993) (finding that 19.85% was not significant); *accord Weil II*, 913 F.2d at 1051–52 (finding that 16.4% was not significant in the absence of "additional factors," and citing cases); *see also Admin. Comm. Sea Ray Employees' Stock Ownership and Profit Sharing Plan v. Robinson*, 164 F.3d 981, 988–89 (6ᵗʰ Cir.

1999) (holding 15.9% insufficient); *Kreis v. Charles O. Townley, M.D. & Assoc.*, 833 F.2d 74, 80 (6ᵗʰ Cir.1987) (holding 15% and 13.6% insufficient); *cf.* 29 U.S.C.A. § 1343(c)(3) (1999) (providing that a plan administrator is not required to inform an employer about the departure of plan participants unless it involves at least 20% of plan participants).

■ Prior to commencing this lawsuit, plaintiffs requested that their former employer declare that there had been a partial termination of the Plan. The Retirement Plan Committee refused, finding that the termination of 187 Lincoln employees out of a total of 1,148 Plan participants (16.29%) was too small to warrant finding a partial termination. Declaration of Richard M. Betheil, dated Oct. 1, 2002 ("Betheil Decl."), Smith Ex. 2 at KW255. While plaintiffs here contend that this calculation was erroneous, they do not contend that a proper calculation limited to Lincoln would exceed 20%.[1] Nor are their half-hearted attempts to demonstrate exceptional or "egregious" circumstances sufficient to raise a genuine factual dispute. Specifically, the mere fact that defendants understood that termination of the Lincoln affiliation would result in forfeiture to St. Barnabas of plaintiffs' pension contribution is inherent in every termination case and hardly constitutes circumstances sufficiently exceptional or egregious to override the 20% test. *See Kreis*, 833 F.2d at 80; *Wishner v. St. Luke's Hosp. Ctr.*, 550 F.Supp. 1016, 1020 (S.D.N.Y.1982).

1. Moreover, contrary to plaintiffs' assertion, the Retirement Plan Committee's calculation of 16.29% was correct or, if anything, too high. *See* Defs.' L.R. 56.1 St. ¶¶ 152, 182–87. Plaintiffs' alternative calculations of 19.65% and 19.51% either erroneously include 48 doctors from Rikers, *see* Pls.' L.R. 56.1 St. ¶ 49; Betheil Decl., Wolf Ex. 23; Deposition of J. Dudley B. Kimball, sworn to Aug. 14, 2002, at 96, or excludes medical residents, *see* Pls.' L.R. 56.1 St. ¶ 50, in contravention of the accepted formula. *See Weil III*, 933 F.2d at 107 & n. 1; *Halliburton*, 100 T.C. at 249.

■ Plaintiffs' primary argument, however, is that the Lincoln and Rikers terminations should be viewed as related for these purposes and that the combined result—termination of up to 40% of the Plan's participants—clearly constitutes evidence of a "partial termination" sufficient to avoid summary judgment. Plaintiffs have failed, however, to come forward with material, admissible evidence sufficient to enable any reasonable fact-finder to view the Lincoln termination—which is the one that impacted plaintiffs—as meaningfully related to the subsequent Rikers termination in any way that implicates the "partial termination" doctrine.

To begin with, all the evidence of record indicates unequivocally that St. Barnabas' arrangements with Lincoln and Rikers were separate and different in every relevant respect. They were entered into months apart, they related not only to very different facilities (a hospital and a prison) but also to significantly different services, numbers and kinds of employees, and terms of compensation, they covered different contractual periods, and they ended at different times.

Further, the undisputed evidence is that the immediate causes for the terminations were likewise significantly different—with the termination of the Lincoln arrangement primarily resulting from disagreements with Lincoln's Executive Director, Jose Sanchez, regarding Lincoln's mission and the like and from HHC's refusal of St. Barnabas' request that Sanchez be removed, and the termination of the Rikers arrangement primarily resulting from separate disagreements regarding the Rikers program with HHC's Correctional Health Services Executive Director, Ernesto Marrero, and from dissatisfaction with HHC's evaluation of St. Barnabas' performance at Rikers. *See, e.g.,* Deposition of Frank Cirillo, sworn to Aug. 22, 2002, at 82–83;

Deposition of Richard Daines, sworn to Jul. 30, 2002, at 75–77, 79–80, 83–84; Gade Dep. at 80–82, 86, 90–91, 124–28, 177–78; Gade Decl. ¶¶ 45–55, 62–67; Declaration of Robert Wild, dated Sept. 12, 2000, ¶¶ 3–6.

As against this undisputed evidence that the Lincoln and Rikers situations were separate and distinct from inception to termination, plaintiffs rely on what they claim was a decision by Dr. Ronald Gade, St. Barnabas' president, made either prior to or contemporaneously with the Lincoln termination, to terminate all business with HHC because he had come to distrust it.

However, the admissible evidence supporting this inference consists, at best, of the following deposition testimony from Dr. Barry Liebowitz, plaintiffs' union president:

Q. Does this refresh your recollection as to when the announcement was made that the Lincoln affiliation would not extend past June 30th?

A. The document states December 1999.

Q. Now, in the period before then do you recall Dr. Gade discussing pensions as an issue in the relationship with the Health and Hospitals Corporation?

A. No.

Q. Do you have any reason to believe that St. Barnabas decided not to extend the affiliation at Lincoln in order to retain pension money for itself?

A. I don't think in those terms. I refuse at this point to think in those terms.

Q. Well, do you have any—

A. I refuse to think in those terms. I do not let my mind go in that direction because if I did, I would not—I consider Ron Gade a friend

of mine. All right. And I consider him a good person that tried and got beaten up by bureaucracy. I consider him finding himself in hell at Lincoln, because you mentioned another name, Sanchez, which is one I left out, who was a major player there, and I don't want to think in any other terms. I do feel that after he got beaten up so much at Lincoln, he knew that he could not stay at Rikers any longer either because as he had a Sanchez at Lincoln, he had a Marrero at Rikers, so I knew then and he—I think he stated directly "right after this comes Rikers," you know, and I said, "you are throwing away the largest contract in the United States, for the prison health services they are one of the largest municipal contracts." He says, "I can't deal with these people." And so I believe a decision was made to walk away from both institutions, if not at the exact moment, but in a nanosecond later that there was no recourse with these people because he is still dealing with these people.

Deposition of Barry Liebowitz, sworn to Aug. 8, 2002, at 57–59.[2]

Even on its face, this testimony confirms that whatever dissatisfaction Dr. Gade had with HHC arose from separate disagreements with Sanchez regarding Lincoln and with Marrero regarding Rikers. The suggestion that whatever more general subjective distrust of HHC these specific problems allegedly led Dr. Gade to harbor was in any meaningful way a proximate cause of the December, 1999 decision to terminate the Lincoln arrangement is too vague, remote, and extended an inference to avoid summary judgment.

■ Plaintiffs' other claim (Count Three of the Amended Complaint) is that St. Barnabas' decision to terminate the Lincoln affiliation was undertaken "for the purpose of interfering with the attainment of any right" under an employee benefit plan, in violation of ERISA § 510, 29 U.S.C.A. § 1140 (1999). But, as already noted, defendants have proffered undisputed evidence that their decision to terminate the Lincoln affiliation was caused by dissatisfaction with Sanchez, with HHC's refusal to terminate him, and with Lincoln's mission in general; and plaintiffs, even while arguing that the Lincoln termination was part of a more general distrust of HHC, have offered no evidence whatsoever that an intent to violate plaintiffs' pension rights was a " 'motivating factor' " behind the Lincoln termination. *Dister v. Cont'l Group, Inc.*, 859 F.2d 1108, 1111 (2d Cir.1988). Rather, they rely simply on the fact that, as in virtually every such case, defendants were aware that a by-product of such termination would be costs savings, including savings on pension benefits. Awareness of such inherent savings, however, is insufficient by itself to raise a genuine issue of material fact that defendants' motivation for the termination was to violate plaintiffs' pension rights. *See Unida v. Levi Strauss & Co.*, 986 F.2d 970, 980–81 (5th Cir.1993); *Dister*, 859 F.2d at 1117 n. 1.

---

**2.** After his deposition was taken and the instant motion practice began, Liebowitz offered similar, though more conclusory, assertions in a Declaration dated September 30, 2002, ¶ 7, which, in any event, cannot be held to supersede his deposition testimony on the same subject. *See Brown v. Henderson,* 257 F.3d 246, 252 (2d Cir.2001). Also, another witness, Keith Wolf, testified that Dr. Gade had separately informed him that he regarded both Sanchez and Marrero as dishonest. Deposition of Keith Wolf, sworn to Aug. 6, 2002, at 131, 142. The rest of the "evidence" proffered by plaintiffs on this issue is either inadmissible or irrelevant.

Accordingly, for the foregoing reasons, summary judgment is granted to defendants on all claims. Clerk to enter judgment.

SO ORDERED.